**SYLVESTER BROTHERS DEVELOPMENT COMPANY, d/b/a East Bethel Landfill, Appellant,**

v.

**GREAT CENTRAL INSURANCE COMPANY, et al.,
Defendants,**

**The Federated Mutual Insurance
Company, Respondent,**

**Commercial Union Insurance Company,
et al., Respondents,**

**North River Insurance Company, a/k/a
U.S. Insurance Group, Respondent.**

**Auto–Owners Insurance Company,
Respondent,**

**Interstate Fire & Casualty
Company, Respondent.**

No. C0–91–1080.

Court of Appeals of Minnesota.

Jan. 28, 1992.

Review Denied March 26, 1992.

Forest D. Nowlin, Gary Hansen, Dawn L. Gagne, Timothy J. Dolan, Doherty, Rumble & Butler, P.A., St. Paul, for Sylvester Bros., Development Co. d/b/a East Bethel Landfill.

James Jardine, Joseph T. Treanor, Jardine, Logan & O'Brien, St. Paul, for Great Cent. Ins. Co., et al., and Federated Mut. Ins. Co.

John M. Anderson, Charles E. Lundberg, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for Commercial Union Ins. Co., et al.

B.C. Hart, David E. Bergquist, Fabyanske, Svoboda, Westra, Holper & Davis, Minneapolis, Stephen H. Cohen, McElroy, Deutsch & Mulvaney, Morristown, N.J., for North River Ins. Co., a/k/a U.S. Ins. Group.

James A. Reding, Sylvia Ivey Zinn, Reding & Votel, St. Paul, for Auto–Owners Ins. Co.

Dale O. Thornsjo, Peterson & Hektner, Ltd., Minneapolis, for Interstate Fire & Cas. Co.

David E. Herr, Mary R. Vasaly, Maslon Edelman Borman & Brand, Minneapolis, for amicus curiae East Bethel PRP Group.

Hubert H. Humphrey, III, Atty. Gen., Stephen Shakman, Barbara Lindsey Sims, Sp. Asst. Attys. Gen., St. Paul, for amicus curiae State of Minn.

Larry D. Espel, Thomas J. Barrett, Thomas C. Mielenhausen, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for amici curiae Honeywell, Inc., et al.

Michael Berens, Andrea L. Sahlin, Kelly & Berens, P.A., Minneapolis, and Thomas W. Brunner, Carol Barthel, James M. Johnstone, Wiley, Rein & Fielding, Washington, D.C., for amicus curiae Ins. Environmental Litigation Assoc.

Robert M. Austin, Lauris A. Heyerdahl, Austin & Abrams, Minneapolis, and Diane L. Jennings, John B. Haarlow, Stephen M. Murray (of counsel), Lord, Bissell & Brook, Chicago, Ill., pro hac Vice, for amicus curiae John Richard Lundbrook Youell.

Considered and decided by SHORT, P.J., and SCHUMACHER, and KLAPHAKE, JJ.

## OPINION

SHORT, Judge.

This action involves the question of insurance coverage for groundwater contamination caused by the leaching of pollutants from a landfill. Appellant Sylvester Brothers Development Company (the operator) brought an action for declaratory judgment against its general and excess insurance carriers to determine which of the insurance companies were liable to pay the costs of remedying the environmental damage. The operator reached settlement agreements with two insurance companies, Great Central Insurance Company and Northwestern National Insurance Company. The remaining insurers moved for summary judgment based primarily on the pollution exclusion clause in their respective policies. In granting summary judgment for the insurers, the trial court held the cost of remedying groundwater contamination was not covered as property damage under the insurance policies. On appeal, the operator argues the trial court erred in concluding the polluting activity was a continuous and repeated process and in interpreting the exception to the pollution exclusion provision. Even if the pollution exclusion clause does not bar the operator's claims, the insurers argue they are entitled to summary judgment because the groundwater contamination is not an "occurrence" as defined in their policies and the contamination was a "known risk." We affirm in part, reverse in part, and remand.

## FACTS

In 1969, before there were state or county regulations governing disposal of waste, the operator established an open dump at the East Bethel landfill site in Anoka County. At that time, waste received by the operator included film and photo processing chemicals, oil filters containing waste oil, asphalt and solvents, paint, ink, liquid ether, foundry slag, asphalt tar, roofing materials, waste ash, kerosene, oil-soaked rags, cleaning solvents and dry cleaning solvents. Some of the waste arrived in 55–gallon drums. Before covering the drums with soil, the operator instructed its employees to puncture the drums to allow their contents to drain onto the ground. This procedure was believed necessary to minimize the risk of explosion when the drums were crushed or compacted. At that time, operators believed the soil underlying a dump or landfill would act as a filter to prevent pollutants from migrating into and contaminating the groundwater.

In 1970 and 1971, regulations were adopted by both the Minnesota Pollution Control Agency (MPCA) and Anoka County which prohibited the acceptance of toxic and hazardous waste by landfills because of the potential for causing groundwater problems. Following promulgation of these regulations, the operator ran the East Bethel site as one of the state's first sanitary landfills. Anoka County recommended that hazardous wastes be placed into a transfer facility until they could be removed to an approved hazardous waste facility. As part of the licensing requirement, the operator also installed wells to provide access for monitoring the groundwater.

In 1974, East Bethel became a "modified sanitary" landfill, accepting only demolition fill, certain waste generated by companies involved in the construction industry and municipal solid waste brought by individuals living in the area. The landfill continues to operate as a modified sanitary/demolition landfill today.

In 1980, Anoka County hired an engineering firm to evaluate data collected

from the testing of groundwater at four of the county's landfill sites. In January of 1981, the engineering firm submitted a report to Anoka County which stated the liquid that percolated through the landfill (leachate) from the waste deposits had affected the groundwater quality.

Based on the available data, it is concluded that leachate migration from [East Bethel] likely does not represent an imminent health hazard. Site specific landfill monitoring data, however, indicate that leachate migration from * * * East Bethel * * * has affected the quality of the surface groundwater systems downgradient of the refuse * * * * This finding is based on groundwater monitoring which shows elevated levels of parameters which are indicative of landfill leachate in monitoring wells downgradient of the refuse * * * * Data collected in 1978 by the MPCA confirmed that Well 3 is the well that is most affected by leachate * * * *

Based upon the preceding evaluation, leachate is being generated by this landfill and has impacted the quality of groundwater at Well 3 and at the trailer well. The groundwater elevation data indicate that leachate from a portion of the landfill will move to the southwest and that leachate from the remaining portion of the landfill will move to the wetland tributary to Neds Lake. The data do not indicate the presence of an imminent hazard but *potential* risks are that the leachate plume could move to the southwest and affect existing or future water supply wells in that area; that groundwater mounding beneath the refuse could cause leachate to migrate radially from the landfill and affect possible future wells northwest of the landfill; and that vertical migration could occur in the future and affect the quality of deeper aquifers. Until the present limits and quality of the leachate plume are better defined, the likelihood of these risks occurring cannot be predicted. The existing monitoring system is not adequate to define the limits of the leachate plume.

(Emphasis in original.) On January 22, 1981, Anoka County sent a copy of this report to the operator. The letter accompanying the report expressly referred to "the impact of landfill on our groundwater resources."

In June 1982, a report prepared by another engineering firm indicated the leachate impact had extended beyond the southern boundary of the East Bethel site. In 1984, engineers concluded there was extensive groundwater contamination at East Bethel. The MPCA placed East Bethel on the permanent list of priorities established under the Minnesota Environmental Response and Liability Act (MERLA), Minn.Stat. ch. 115B (1984). The MPCA notified the operator it was considered a potentially responsible party for studying and remediating the groundwater contamination. Further review and examination of soil and groundwater quality confirmed that East Bethel could be the source from which hazardous substances were entering the groundwater.

In 1985, the MPCA requested the operator to sign a consent order agreeing to perform an investigation and cleanup of groundwater contamination at East Bethel. Under the consent order, the operator is obligated to pay the costs it incurs in performing these activities and to reimburse the MPCA for any costs it incurs in supervising, reviewing and performing tests relative to the MERLA study and remedial action. The operator seeks to recover all of these costs from its insurers.

ISSUES

I. Are there disputed fact issues concerning whether the operator expected groundwater contamination at the East Bethel site?

II. What is the critical event for purposes of determining the applicability of the pollution exclusion provision?

III. Is the exception to the pollution exclusion clause ambiguous?

IV. Did the operator improperly submit materials on appeal?

## ANALYSIS

■ On appeal from a grant of summary judgment, this court determines whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. *Offerdahl v. University of Minnesota Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). We view the evidence in the light most favorable to the non-moving party, and do not defer to a trial court's application of the law. *See Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984). The interpretation and construction of an insurance policy is a matter of law that the trial court could properly determine on summary judgment, and we may review *de novo* on appeal. *See Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 886–87 (Minn.1978).

### I.

■ Although receiving summary judgment on other grounds, the insurers argue they are also entitled to summary judgment because the groundwater contamination (a) was not an "occurrence" as defined in their policies, and (b) was a "known risk." The trial court denied summary judgment on both grounds, finding genuine issues of material fact exist concerning whether the operator expected or intended the groundwater contamination. We agree with the trial court.

Each of the policies define "occurrence" in a similar fashion. Because the differences in the policies on this point are not important, the language of the Commercial Union policy is cited unless noted otherwise.

The policies define "occurrence" as

* * * an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The United States Court of Appeals for the Eighth Circuit defined the term "expected" as follows:

For the purposes of an exclusionary clause in an insurance policy the word "expected" denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions * * * * The results cease to be expected and coverage is present as the probability that the consequences will follow decreases and becomes less than a substantial probability.

*Auto–Owners Ins. Co. v. Jensen,* 667 F.2d 714, 720 (8th Cir.1981) (quoting *City of Carter Lake v. Aetna Casualty & Sur. Co.,* 604 F.2d 1052, 1058–59 (8th Cir.1979)). The standard is viewed as an objective standard that involves a higher degree of certainty than reasonable foreseeability. *Id.; see also Continental W. Ins. Co. v. Toal,* 309 Minn. 169, 176 n. 3, 244 N.W.2d 121, 125 n. 3 (1976).

Amicus East Bethel PRP Group suggests the plain language of the policies requiring that damage be "neither expected nor intended from the standpoint of the insured" mandates application of a subjective standard. In the amicus' view, the actual expectations and intentions of the operator are controlling. We disagree and apply the objective standard of what a reasonable insured should have known. Viewing the policy as a whole, the quoted language merely clarifies that coverage will still be available for damage caused by the intentional acts of third parties if those acts were unintended "from the standpoint of the insured." *See Lansco, Inc. v. Department of Envtl. Protection,* 138 N.J.Super. 275, 282, 350 A.2d 520, 524 (Ch. Div.1975) (damage caused by the intentional act of vandals in opening insured's oil tank and letting oil spill along a river was covered because, although expected or intended by the vandals, the damage was unexpected from the standpoint of the insured), *aff'd,* 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), *cert. denied,* 73 N.J. 57, 372 A.2d 322 (1977).

Viewing the evidence in the light most favorable to the operator, the record demonstrates: (a) the site was operating relatively free of regulatory violations; (b) the operator itself intended to use the land after the site was closed; (c) the operator followed governmental regulations requir-

ing maintenance of soil filters between deposited wastes and the groundwater; and (d) environmental officials for Anoka County had mere "suspicions of a possibility" of contamination prior to the 1981 engineering report. This evidence creates an issue of material fact as to whether a reasonable insured should have known that groundwater contamination was likely to result either from the operator's dumping activities or from the subsequent ongoing conditions at the East Bethel site.

The operator argues the trial court erred in expanding its inquiries about the operator's expectations beyond the period during which contaminants were actually being deposited into the landfill. We disagree. The policies' definition of "occurrence" includes "continuous or repeated exposure to conditions." Thus, the trial court correctly included an inquiry into whether the operator expected groundwater contamination to result from the ongoing conditions caused by its prior dumping activities.

The policies of all the insurers except Auto–Owners and North River came into effect after the operator received the 1981 engineering report. Those insurers argue that even if the operator's prior conduct and evolving knowledge are disregarded, its receipt of that report establishes conclusively that it expected groundwater contamination. We disagree. As the trial court concluded, the fact finder must weigh the conditional language of the report against the graphs and undisputed leachate impact to determine what notice that report would have given a reasonable insured.

Alternatively, the insurers argue coverage should be barred under the "known risk" doctrine. Again, we disagree because there is an issue of material fact as to whether a reasonable insured should have known prior to the effective date of the policies that contamination had already occurred or might occur. Because of these disputed facts, the trial court properly denied summary judgment on the "occurrence" and the "known risk" issues.

## II.

The trial court concluded the qualified pollution exclusion provision of the parties'

insurance policies excluded coverage for the groundwater contamination at the East Bethel site because the contamination resulted from the operator's routine deposit of harmful materials into the land, and this routine deposit was not sudden and accidental. The operator argues the trial court erred in focusing its analysis on the initial deposit of waste into the landfill rather than on the subsequent release of contaminants from the landfill into the groundwater. Because the language of North River's pollution exclusion differs significantly from the other policies, it will be discussed separately at the end of this section.

### A. All Insurers, Except North River

■ The insurance policies do not cover damages arising out of polluting activities, unless the discharge of pollutants was sudden and accidental. The relevant policy language provides:

> This policy does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants into or upon land, the atmosphere or any water course or body of water. This exclusion does not apply if the discharge, dispersal, release or escape referred to in the exclusion is sudden and accidental.

When landfills began to be licensed in the late 1960s and early 1970s, landfill operators and even many environmental officials expected the design of a landfill would function to contain pollutants. In particular, the soil beneath landfills was expected to act as a filter to prevent pollutants from migrating into the underlying and surrounding ground and surface waters. Since landfills were expected and intended to contain any wastes placed in them, pollutants deposited in a landfill could only cause property damage if there was a "discharge, dispersal, release or escape" of those pollutants from the landfill into the surrounding environment. Thus, the deposit of pollutants into a landfill cannot be

the triggering event; rather, the "escape" is the critical inquiry for purposes of determining the applicability of the pollution exclusion. *See New Castle County v. Hartford Accident and Indem. Co.*, 933 F.2d 1162, 1199–1203 (3d Cir.1991); *Claussen v. Aetna Casualty & Sur. Co.*, 865 F.2d 1217, 1220 (11th Cir.1989); *U.S. Fidelity & Guar. Co. v. Korman Corp.*, 693 F.Supp. 253, 259–60 (E.D.Pa.1988); *Claussen v. Aetna Casualty & Sur. Co.*, 676 F.Supp. 1571, 1573, 1579 (S.D.Ga.1987); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 75–76 (E.D.Mich.1987); *Lower Paxton Township v. United States Fidelity & Guar. Co.*, 383 Pa.Super. 558, 578, 557 A.2d 393, 403 (1989).

The language of the pollution exclusion [1] itself supports our interpretation. Both the exclusion and its exception apply to a "discharge, dispersal, release or escape" of pollutants. All of these terms carry the connotation of the issuance of a substance from a state of containment; none of the terms is normally used to describe the placement of a substance into an area of confinement. *Contra Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 954 F.2d 601, (10th Cir.1992).

Accordingly, we reverse and remand to the trial court for a determination of whether the escape of pollutants from the East Bethel landfill into the surrounding groundwater was sudden and accidental. We recognize the possibility that the trial court may find there has been not one, but several, discharges or releases of pollutants from the landfill during the period in question. If so, the trial court will have to determine whether all, some, or none of these discharges or releases were sudden and accidental.

## B. North River's Pollution Exclusion Provision

■ North River issued excess coverage for the period January 25, 1972 up to and including January 25, 1975. The language in North River's pollution exclusion clause differs from the other policies. The clause provides:

> It is agreed this policy shall not apply to liability for contamination or pollution of land, water, air, real or personal property or any injuries or damages resulting therefrom caused by an occurrence.
>
> \* \* \* \* \* \*
>
> "Occurrence" means a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

The explicit language of the parties' contract is broad enough to exclude coverage for pollution damage caused by a continuous or repeated exposure to conditions, and provides coverage only for pollution damage caused by an accident. Significantly, the North River policy does not make coverage hinge on the "discharge, dispersal, release or escape" of pollutants. Thus, in analyzing North River's liability, the trial court correctly focused on the operator's deposit of wastes into the landfill rather than the escape of contaminants from the landfill into the groundwater. Under these facts, the trial court properly granted summary judgment to North River because it is undisputed the pollution was caused by repeated exposure to conditions caused by the operation of the landfill. Unlike the other policies, North River broadly excluded insurance coverage for damage caused by repeated exposure to any conditions. The operator cannot now argue its ongoing deposit of wastes into the landfill was an accident.

### III.

■ The operator also argues the trial court erred in ruling that the exception to the pollution exclusion provision was not ambiguous. The relevant policy language provides:

---

1. The pollution exclusion clause became part of the general comprehensive liability policy in 1970. *See* Robert Soderstrom, *The Role of Insurance in Environmental Litigation*, 11 Forum 762, 766 (1976).

This exclusion does not apply if the discharge, dispersal, release or escape referred to in the exclusion is *sudden and accidental.*

(Emphasis added.) Because "sudden" is not defined in the policy itself, the term must be given its ordinary, everyday meaning. *Hubred v. Control Data Corp.,* 442 N.W.2d 308, 310–11 (Minn.1989). An ambiguous insurance provision must be interpreted in favor of the insured. *Columbia Heights Motors v. Allstate Ins. Co.,* 275 N.W.2d 32, 36 (Minn.1979).

■ The operator suggests "sudden" can mean (a) happening or coming unexpectedly, or (b) marked by abruptness or haste; brought about in a short time. *Webster's Ninth New Collegiate Dictionary* 1178 (1991). The existence of multiple dictionary definitions of the word "sudden" does not prove the word is ambiguous.[2] Dictionaries are helpful insofar as they set forth the ordinary, usual meaning of the words. However, dictionaries are "imperfect yardsticks of ambiguity." *New Castle County,* 933 F.2d at 1193–94. We must determine whether the word "sudden" is ambiguous in the context of the specific insurance policies at issue. *See Colonie Motors, Inc. v. Hartford Accident & Indem. Co.,* 145 A.D.2d 180, 182, 538 N.Y.S.2d 630, 632 (1989).

■ The use of the conjunctive in the phrase "sudden and accidental" indicates the drafters' intent to define the two words differently, stating two separate requirements. *Lower Paxton Township,* 383 Pa.Super. at 577, 557 A.2d at 402. "Sudden" in the context of the policies carries the temporal connotation of "abruptness." *Lumbermens Mut. Cas. Co. v. Belleville Indus.,* 407 Mass. 675, 679, 555 N.E.2d 568, 572 (1990). "Sudden" means the incident at issue occurs relatively quickly rather than gradually over a long period of time. This is the ordinary meaning in the context of the policies.

Numerous cases have interpreted similar contract language. The cases appear evenly divided between finding the clause bars coverage[3] and finding it does not[4]. We

**2.** Nor is the order of the definitions in the dictionary entry significant in this case. "The system of separating the various senses of a word by numerals and letters is a lexical convenience. It reflects something of their semantic relationship, but it does not evaluate senses or set up a hierarchy of importance among them." *Webster's Ninth New Collegiate Dictionary* 19 (1991).

**3.** *Northern Ins. Co. of New York v. Aardvark Assoc. Inc.,* 942 F.2d 189 (3rd Cir.1991); *Ogden Corp. v. Travelers Indem. Co.,* 924 F.2d 39 (2d Cir.1991); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988) (Kentucky Law); *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d 30 (1st Cir.1984) (New Hampshire Law); *CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.,* 759 F.Supp. 966 (D.R.I.1991) (New Jersey law); *Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc.,* 731 F.Supp. 1517 (M.D.Fla.1990); *United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 734 F.Supp. 437 (D.Kan.1990); *United States Fidelity & Guar. Co. v. Murray Ohio Mfg. Co.,* 693 F.Supp. 617 (M.D.Tenn.1988), *aff'd,* 875 F.2d 868 (6th Cir.1989); *Borden Inc. v. Affiliated FM Ins. Co.,* 682 F.Supp. 927 (S.D.Ohio 1987), *aff'd,* 865 F.2d 1267 (6th Cir.1989), *cert. denied,* 493 U.S. 817, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 212 Ill.App.3d 231, 156 Ill.Dec. 432, 570 N.E.2d 1154 (Ill.App. 2d Dist.1991); *Barmet of Indiana, Inc. v. Security Ins. Group,* 425 N.E.2d 201 (Ind.Ct.App.1981); *Lumbermens Mut. Cas. Co. v. Belleville Indus.,* 407 Mass. 675, 555 N.E.2d 568 (1990); *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 476 N.W.2d 392 (1991); *Technicon Elecs. Corp. v. American Home Assurance Co.,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989); *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986); *Transamerica Ins. Co. v. Sunnes,* 77 Or.App. 136, 711 P.2d 212 (1985), *rev. denied,* 301 Or. 76, 717 P.2d 631 (1986); *Lower Paxton Township v. United States Fidelity & Guar. Co.,* 383 Pa.Super. 558, 557 A.2d 393 (1989).

**4.** *Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Benedictine Sisters of St. Mary's Hosp. v. St. Paul Fire & Marine Ins. Co.,* 815 F.2d 1209 (8th Cir. 1987); *Allstate Ins. Co. v. Quinn Constr. Co.,* 713 F.Supp. 35 (D.Mass.1989); *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co.,* 668 F.Supp. 1541 (S.D.Fla.1987); *United States v. Conservation Chem. Co.,* 653 F.Supp. 152 (W.D.Mo.1986); *Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083 (Colo.1991); *Claussen v. Aetna Casualty & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686 (1989); *United States Fidelity & Guar. Co. v. Specialty Coatings Co.,* 180 Ill. App.3d 378, 129 Ill.Dec. 306, 535 N.E.2d 1071 (Ill.App. 1st Dist.1989), *appeal denied,* 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989);

find the cases largely unhelpful due to the varying factual and procedural backgrounds[5], underlying public policy interests,[6] and unique state rules of interpretation[7]. Because many courts' interpretations of "sudden and accidental" appear to be explained by these unique procedural, factual or policy issues, we do not view the cases as having significant precedential value in resolving the legal interpretation issue at hand.

The operator contends our decision in *Grinnell Mut. Reins. Co. v. Wasmuth*, 432 N.W.2d 495 (Minn.App.1988), *pet for rev. denied* (Minn. Feb. 10, 1989) requires a finding that the "sudden and accidental" exception is ambiguous. We disagree. The principal basis for our decision in *Grinnell* was the "reasonable expectations" doctrine. *Id.* at 499. This court repeatedly emphasized the unique facts in *Grinnell* as being the basis for its conclusion. Rather than support a finding of ambiguity, *Grinnell* supports our conclusion that "sudden and accidental" is unambiguous because this is precisely the type of "typical" pollution case in which *Grinnell* found the scope of the pollution exclusion clause to be unambiguous. *Id.* at 498–500.

The pollution exclusion provision is ambiguous only if it is reasonable to interpret

"sudden" as "unexpected," devoid of any temporal connotation. "Unexpected" is not a reasonable interpretation in the context of the policies because "unexpected" is conveyed by the term "accidental." If "sudden" meant "unexpected," "sudden" would become superfluous and repetitious in the policies' use of the phrase "sudden and accidental." *See Lumbermens Mut. Cas. Co.*, 407 Mass. at 680, 555 N.E.2d at 572; *Technicon Elecs. Corp. v. American Home Assurance Co.*, 141 A.D.2d 124, 133–34, 533 N.Y.S.2d 91, 97 (1988), *aff'd*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989). We thus conclude that "sudden" is susceptible of one reasonable interpretation in the context of the policies, and the exception to the pollution exclusion provision therefore is not ambiguous. In light of the record before us, it is hard to imagine that the seepage was "sudden." However, it is not our role to decide disputed facts.

## IV.

 The insurers argue a variety of written materials submitted on appeal by the operator should be stricken from the appellate record. We find nothing improper in the operator's submission of law review articles and relevant cases from other

---

*Du–Wel Prods., Inc. v. United States Fire Ins. Co.*, 236 N.J.Super. 349, 565 A.2d 1113 (1989), *cert. denied*, 121 N.J. 617, 583 A.2d 316 (1990); *Colonie Motors, Inc. v. Hartford Accident & Indem. Co.*, 145 A.D.2d 180, 538 N.Y.S.2d 630 (1989); *Kipin Indus. v. American Universal Ins. Co.*, 41 Ohio App.3d 228, 535 N.E.2d 334 (1987); *United Pacific Ins. Co. v. Van's Westlake Union, Inc.*, 34 Wash.App. 708, 664 P.2d 1262 (1983), *rev. denied*, 100 Wash.2d 1018 (1983); *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 456 N.W.2d 570 (1990); *Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724 (Wyo.1988).

5. Many of the cases are duty to defend cases which have a much lower standard for finding coverage. *See, e.g., United States Fidelity & Guar. Co. v. Murray Ohio Mfg. Co.*, 693 F.Supp. 617 (M.D.Tenn.1988), *aff'd*, 875 F.2d 868 (6th Cir.1989); *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co.*, 668 F.Supp. 1541 (S.D.Fla.1987); *United States Fidelity & Guar. Co. v. Specialty Coatings Co.*, 180 Ill.App.3d 378, 129 Ill.Dec. 306, 535 N.E.2d 1071 (Ill.App. 1st

Dist.1989), *appeal denied*, 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989).

6. On one side are the interests in compensating victims of pollution damage and assuring the cleanup of environmental damage. On the other side is the interest in preserving the financial integrity of liability insurers, many of whom would be bankrupted by the astronomical costs associated with pollution damages and environmental cleanup. *See* E. Joshua Rosenkranz, Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 Geo.L.Rev. 1237, 1237–40, 1278–81 (1986).

7. *See, e.g., Buckeye Union Ins. v. Liberty Solv. & Chem.*, 17 Ohio App.3d 127, 132, 477 N.E.2d 1227, 1234 (1984) (the mere fact that the terms "sudden and accidental" are not defined in the insurance policy is itself enough to establish that the pollution exclusion clause is ambiguous); *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 745, 456 N.W.2d 570, 573 (1990) ("The very fact that recognized dictionaries differ on the primary definition of 'sudden' is evidence in and of itself that the term is ambiguous.").

jurisdictions. These materials are not evidence outside the record, but rather are legal resources. As for the documents pertaining to the drafting history of the pollution exclusion clause, we have no use for these materials because the exception to the exclusion clause is susceptible of only one reasonable interpretation. *See Flynn v. Sawyer,* 272 N.W.2d 904, 907–08 (Minn. 1978) (parol evidence is inadmissible to vary the terms of a written agreement absent ambiguity or incompleteness); *Pedersen v. United Services Auto Ass'n,* 383 N.W.2d 427, 430 (Minn.App.1986) (extrinsic evidence is inadmissible to construe an insurance policy absent ambiguity in the policy language).

## DECISION

We commend the trial court for its thorough and thoughtful analysis of this case. Nonetheless, in our view the trial court erred in focusing its inquiry on the operator's deposit of pollutants into the landfill for purposes of denying coverage. The triggering event for purposes of determining the applicability of the pollution exclusion clause is the escape of the contaminants from the East Bethel landfill into the groundwater. The pollution exclusion provision is not susceptible of more than one reasonable interpretation. The North River policy language is broad enough to bar coverage under the undisputed facts of this case. As to the more restrictive language contained in the other insurers' pollution exclusion provisions, we find numerous issues of material fact concerning (a) whether the operator expected or intended the contamination and (b) whether the release was sudden and accidental. Therefore, summary judgment is inappropriate.

Accordingly, we affirm the trial court's determination that (a) the exception to the pollution exclusion clause is not ambiguous, and (b) North River is entitled to judgment as a matter of law. But we reverse and remand on the issue of coverage as to the remaining insurers because there are material issues of fact in dispute.

Affirmed in part, reversed in part and remanded.