**AMERICAN STATES INSURANCE COM-PANY, an Indiana Corporation, as Successor-in-Interest to the Western Casualty and Surety Company, a Kansas corporation, Plaintiff,**

v.

**MANKATO IRON & METAL, INC., a Minnesota corporation, Defendant.**

Civ. No. 3–92–728.

United States District Court,
D. Minnesota,
Third Division.

Nov. 30, 1993.

John M. Anderson, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, MN, for plaintiff.

Kenneth R. White, Farrish, Johnson & Maschka, Mankato, MN, for defendant.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

This matter arises out of a declaratory judgment action brought by the plaintiff, American States Insurance Company ("American States") to resolve whether coverage exists for certain pollution-related claims under any of the policies that American States's predecessor issued to the insured, Mankato Iron & Metal ("Mankato"). Before the Court presently are American States's motion for summary judgment, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure (Doc. No. 9), and Mankato's motion for certification of a question to the Minnesota Supreme Court, brought pursuant to Rule 103.03(h) of the Minnesota Rules of Civil Appellate Procedure (Doc. No. 13).[1] American States seeks a determination that, as a matter of law, it owes no obligation under the policies issued to Mankato to indemnify or defend Mankato in two environmental cleanup lawsuits filed against Mankato. Mankato asks the Court to certify to the Minnesota Supreme Court the question of whether the "sudden and accidental" language in the pollution exclusion of comprehensive general liability policies is ambiguous when dealing with non-active polluters. For the reasons set forth below, the Court grants plaintiff's motion for summary judgment and denies defendant's motion for certification.

### Background

Mankato is a closely-held corporation that recovers and recycles scrap metal. In particular, Mankato buys and sells automobiles. For a time, secondary to its trade in automobiles, Mankato also bought and sold used automobile batteries for recycling. From April 30, 1979 to December 24, 1981, Mankato sold used batteries and other lead products to Gould, Inc. (Aff. of Greg Pooley ¶¶ 4–5.) Gould recycled these batteries at two secondary lead smelting and battery recycling facilities: one in Omaha, Nebraska, and the other in Savanna, Illinois. Gould operated the Omaha site from 1963 to 1982 (Douglas County Compl. ¶ 109.); it operated the Savanna site from August of 1980 to about May of 1982. (Savanna Compl. ¶ 110.)

The political entity of Douglas County, Nebraska, purchased the former Gould facility in Omaha in 1984. Tests conducted in 1987 and 1988 revealed that the soil and subsoil were contaminated with lead, arsenic, antimony and cadmium. (Douglas County Compl. ¶ 112.) Douglas County incurred cleanup costs of approximately $6,000,000. (Douglas County Compl. at ¶ 247.) Regarding the Savanna facility, the Illinois Environmental Protection Agency ("IEPA") requested that investigations be conducted after Gould ceased operations in May of 1982. (Savanna Compl. ¶ 214.) These investigations revealed that the site was contaminated with lead and other hazardous substances. Gould entered into a consent decree with the IEPA under which Gould has incurred and

---

1. On October 18, 1993—ten days before American States's motion was set for a hearing—Mankato also filed a "Motion for Summary Judgment" (Doc. No. 12), noticed to be heard the same day as American States's motion. Local Rule 7.1(b)(1) requires that a moving party file any dispositive motions and supporting documents at least 28 days prior to the scheduled hearing. Although the "Motion for Summary Judgment" was untimely filed, the supporting memorandum was timely filed as a response to American States's motion and the Court has treated it accordingly.

will continue to incur cleanup costs. (Savanna Compl. ¶ 215.)

On November 4, 1991, Mankato, along with one hundred other defendants, was served with a summons and complaint in connection with the Omaha site.[2] The complaint alleges that Mankato "by contract, agreement or otherwise arranged for the disposal or arranged for the transportation for disposal of used or spent batteries, battery tops or bottoms, lead dross or other lead waste at the facility . . . from which there was a release or threatened release for which Douglas County incurred response costs." (Douglas County Compl. ¶ 168.) The only allegation in the complaint addressing when the releases or threatened releases occurred states that the release of contaminants took place over the forty-two year period, from 1940 to 1982, in which Gould or Gould's predecessor operated the facility. (Douglas County Compl. ¶¶ 108–11, 113–14.)

On December 20, 1991, Mankato was served with a similar summons and complaint by Gould in connection with the Savanna site.[3] The Savanna complaint contains no allegations as to when hazardous substances were released other than that the release or threatened release occurred during the period in which Gould or its predecessor operated the facility—that is, prior to May of 1982. (Savanna Compl. at ¶ 111.)

Mankato purchased insurance coverage from Western Casualty and Surety Company ("Western") through a local agent, First Insurance Mankato. It is undisputed that, between August 31, 1983 and August 31, 1987, Western issued comprehensive general liability ("CGL") policies to Mankato. Mankato asserts that it also purchased CGL policies from Western (also through First Insurance Mankato) for the periods from July 1, 1975 to August 31, 1983 and from August 31, 1987 to August 31, 1989. Unfortunately, neither party has produced policies from the period prior to August 31, 1983.[4]

Upon being served in the two environmental lawsuits, Mankato tendered defense of these suits to American States pursuant to the CGL policies. American States denied coverage for both the Douglas County and Savanna litigation on July 31, 1992. American States thereupon instituted this declaratory judgment action to resolve the question of its liability under the CGL policies.

## Discussion

### I. The Summary Judgment Standard

█ Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under that Rule:

> [summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

2. Douglas County seeks a declaration that all the defendants are jointly and severably liable under section 107(a)(3) of the Comprehensive Environmental Response and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(3); a declaration that all defendants are liable for all future costs incurred by Douglas County at said site pursuant to section 113(g)(2) of CERCLA; recovery from all defendants for all response costs incurred in conjunction with the site; and recovery of Douglas County's costs and attorney's fees incurred in the underlying action. (Compl. ¶ 12)

3. Gould seeks a declaration that all defendants are jointly and severably liable for Gould's response costs under section 107(a) of CERCLA, contribution under section 113(f) of CERCLA and recovery of response costs incurred by Gould in conjunction with the Savanna site. (Compl. ¶ 17.)

4. In response to the Court's request at oral argument, Mankato submitted a letter, dated November 1, 1993, to the Court addressing the applicability of a Fifth Circuit case that American States cited at the hearing, *Bituminous Casualty Insurance Co. v. Vacuum Tanks, Inc.*, 975 F.2d 1130 (5th Cir.1992). Attached to that letter was a copy of a CGL policy issued by Western to Mankato apparently covering the period from March 6, 1982 to March 6, 1983. That copy was not attached to any authenticating affidavit and is therefore not properly before the Court.

Initially, the movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in a light most favorable to that party. *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513; *Trnka v. Elanco Prod.*, 709 F.2d 1223, 1225 (8th Cir.1983). Where a moving party, with whatever it provides the court, makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514; *Fischer v. NWA, Inc.* 883 F.2d 594, 599 (8th Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990).

On a motion for summary judgment, the court's task is not to weigh facts or evaluate the credibility of affidavits and other evidence. Rather, the Court need only determine whether the record, as identified by the parties, shows the existence of a real controversy over a material issue, such that the controversy must be resolved by the finder of fact at trial. In addition, the nonmovant cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992) (citation omitted).

## II. Coverage Under the Policies.

### A. Establishing a Prima Facie Case of Coverage

American States asserts that the insured bears the initial burden of establishing a prima facie case that it is entitled to coverage. *Boedigheimer v. Taylor*, 287 Minn. 323, 178 N.W.2d 610, 614 (1970) (insured seeking coverage for collision in which he was driving an automobile owned by someone else must establish proof of the existence of an insurance contract and compliance with the "nonowned automobile" definition in the policy). An insured may satisfy this burden by producing the original policy. *Topinka v. Minnesota Mut. Life Ins. Co.*, 189 Minn. 75, 248 N.W. 660, 661 (1933). An insured may also establish a prima facie case of coverage through circumstantial evidence. *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 975 F.2d 1130, 1132 (5th Cir.1992); *New York v. Blank*, 820 F.Supp. 697, 701–02 (S.D.N.Y. 1993). American States argues that Mankato has failed to establish a prima facie case of coverage.

Mankato began selling lead and used automobile batteries to Gould in April of 1979. Therefore Mankato can have no claims in connection with the former Gould facilities prior to April of 1979. The policy in effect on April 30, 1979 was issued on July 1, 1978. (Aff. of Greg Pooley, Exh. 1.) Although Mankato asserts that it had purchased CGL coverage from Western until October 1, 1989, the Court notes that the policies that Mankato purchased through First Insurance Mankato, effective for the period from August 31, 1987, to October 1, 1989 were issued by CNA Insurance Company. (Aff. of Greg Pooley, Exh. 1.) Mankato has failed to identify CNA; the Court therefore concludes that it is unrelated to either Western or American States. The Court determines that any issue of coverage must be discussed in connection with the policies effective from July 1, 1978 to August 31, 1987.

Mankato has produced copies of the CGL policies Western issued effective between August 31, 1983 and August 31, 1987. Neither party, however, has produced either the policies or specimens of CGL policies that Western issued for the period between July 1, 1978 and August 31, 1983. Mankato has introduced evidence of the policy numbers and effective dates of the policies issued for that period and the fact that they were is-

sued by Western. (Aff. of Del Meyer, Exh. 2.) Mankato has also offered the averments of its president and the manager of First Insurance Mankato that those policies were CGL policies. (Aff. of Greg Pooley at ¶ 2; Aff. of Del Meyer at ¶ 2.) Finally, Mankato has identified the clause providing bodily injury and property damage coverage in the CGL policies of which it does have copies.[5]

Citing the Fifth Circuit Court of Appeals' decision in *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 975 F.2d 1130 (5th Cir.1992), American States argues that the evidence Mankato has adduced is insufficient to withstand summary judgment. In *Vacuum Tanks*, the court of appeals determined that, although Texas law allows the insured to prove the terms of an insurance contract through secondary evidence, Texas law "requires evidence of the policy terms, not just evidence of the existence of the policy." 975 F.2d at 1132 (citing *Ranger Cty. Mut. Ins. Co. v. Chrysler Credit Corp.*, 501 S.W.2d 295, 298 (Tex.1973)). The Fifth Circuit therefore adjudged the insured's introduction of the policy numbers, dates of coverage, and coverage amounts to be "insufficient for the court to make coverage decisions absent proof of the actual policy terms." *Id.* at 1132–33.

■ Unlike Texas law, Minnesota law does not clearly articulate the proof required of an insured to state a prima facie claim of coverage when the policy is lost or destroyed. Mankato has offered evidence of the policy terms of the missing policies by offering the coverage clause that has appeared without substantial variation in CGL policies for four consecutive years from 1983 to 1987. (Compl., Exhs. A–D.) The Court finds that the insured's establishment through circumstantial evidence of the terms of missing policies, not rebutted by the insurer, is sufficient to survive a motion for summary judgment. *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F.Supp. 1420, 1422 (D.Del.1992). Taking all of Mankato's evidence as true, and drawing from it all reasonable inferences, the Court determines that a jury could reasonably find that Western issued CGL policies to Mankato between July 1, 1978 and August 31, 1983 that contained language substantially the same as that found in the August 31, 1983 CGL policy.

## B. The pollution exclusions

■ Once the insured has established a prima facie case of coverage under the policy, the burden shifts to the insurer to demonstrate an exclusion to coverage. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986); *Boedigheimer*, 178 N.W.2d at 614. American States argues that pollution exclusion clauses in the CGL policies prevent Mankato from obtaining coverage under any policy Western issued. The policy Western issued covering the period from August 31, 1986 to August 31, 1987, contains an "absolute" pollution exclusion clause.[6] The poli-

---

5. That language reads as follows:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
> A. bodily injury, or
> B. property damage
> to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend against any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent....

(Compl., Exh A at Section II, subd. I.)

The August 31, 1983 policy—and all the subsequent policies—define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

6. The policies provided as Exhibits C and D to American States's complaint—effective August 31, 1985 to August 31, 1986 and August 31, 1986 to August 31, 1987—include endorsements that modify the CGL policy as follows:

> It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, soot, fumes, acids, alkalis or toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:
> (1) to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
> (a) at or from premises owned, rented, or occupied by the named insured;
> (b) at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste;

cies Western issued covering the period from August 31, 1983 to August 31, 1986 contain the following "qualified" pollution exclusion:

This insurance does not apply:

\* \* \* \* \* \*

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis or toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or other pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.

With respect to the policies Western issued between July 1, 1978 and August 31, 1983, American States has offered evidence that, from at least 1976 onward, the CGL policies issued by Western all contained the same "qualified" pollution exclusion found in the Insurance Service Office's ("ISO") standard policies. (Aff. of Gary Cantrell ¶¶ 2–4.) The language of the ISO pollution exclusion is the same as that found in the policies for 1983–1984 and 1984–1985. (Aff. of Gary Cantrell ¶ 4.) Mankato has failed to offer any evidence rebutting the American States's evidence.[7] The Court concludes that any CGL policy issued by Western prior to August 31, 1985 would contain a qualified pollution exclusion. It now remains to determine the applicability of those exclusions to the instant case.

### 1. The absolute pollution exclusion.

■ The Minnesota Court of Appeals interpreted the absolute pollution exclusion found in the endorsements Western issued to modify its CGL policies after August 31, 1985 in *League of Minnesota Ins. Co. v. Coon Rapids,* 446 N.W.2d 419 (Minn.Ct.App.1989). The court held that the exclusion clearly and unambiguously excluded coverage for any "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape" of pollutants. *Id.* at 422.

Mankato argued at the hearing on this motion that the decision of one panel of the state's intermediate appellate court is not binding on the next. *In re Rodriguez,* 506 N.W.2d 660 (Minn.Ct.App.1993) (panel distinguishes decision of prior panel and states that even if it could not be distinguished, this panel would reject the prior panel's decision and adopt a position consistent with the dissent). Decisions of the Minnesota intermediate appellate court are not binding on the federal courts; however "they are persuasive authority, and we must follow them when they are the best evidence" of the state's law. *Garnac Grain Co. v. Blackley,* 932 F.2d 1563, 1570 (8th Cir.1991). Mankato has not provided the Court with any argument that the *League of Minnesota* decision is not an accurate or adequate reflection of Minnesota law. The Court concludes that the absolute policy exclusion is clear and unambiguous and finds that, under those policies containing the endorsement, Mankato is unable to bring a claim for indemnification or defense against American States.

---

(c) which are at any time transported, hauled, stored, treated, disposed of or processed as waste by or for the named insured or any person or organization for whom the named insured may be legally responsible; or

\* \* \* \* \* \*

(2) to any loss, cost or expenses arising out of any governmental discretion or request that the named insured test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis or toxic chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Subparagraph (a) . . . of paragraph (1) of this exclusion does not apply to bodily injury or property damage caused by heat, smoke or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

Neither endorsement states an effective date. American States has argued under the assumption that the absolute exclusion was found only in the policy issued for 1986–1987. Mankato has asserted that the absolute exclusion also modified the 1985–1986 policy.

7. At the hearing on the motion, Mankato stated that it had not had the opportunity to depose Mr. Cantrell.

## 2. The qualified pollution exclusion.

### (a) Choice of law analysis

As a threshold matter, the Court must resolve which state's law applies to the interpretation of the qualified pollution exclusion. American States argues that Minnesota law should apply to the interpretation of the policies, which were issued in Minnesota to a Minnesota insured. Mankato argues that the law of the states in which the pollution sites are located—Illinois and Nebraska—should apply.

As this is a diversity case, this Court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). A choice of law analysis is only necessary when a conflict clearly exists—that is, when the choice of one state's law is "outcome determinative." *Myers v. Governmental Employees Ins. Co.*, 302 Minn. 359, 225 N.W.2d 238, 241 (1974). Here, a conflict exists.

The Minnesota Court of Appeals has consistently held that a pollution exclusion clause such as the one at issue here has a temporal connotation; to be considered "sudden," a release must occur abruptly. *Board of Regents v. Royal Ins. Co.*, 503 N.W.2d 486, 491 (Minn.Ct.App.1993), *rev. granted* (Aug. 16, 1993); *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 503 N.W.2d 793, 799 (Minn.Ct. App.1993) (*Sylvester II*); *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368, 376 (Minn.Ct.App.1992) (*Sylvester I*). In contrast, the Illinois Supreme Court has found that the exclusion clause does not apply to releases that are unexpected and unintended; Illinois courts have not required a temporal component in construing the "sudden and accidental" exception to the exclusion. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 704–05, 607 N.E.2d 1204, 1217–18· (1992). Nebraska law has not·squarely addressed the meaning of the "sudden and accidental" language in the exclusion clause. To the extent that there is no law on the issue, the law is considered uncertain and in conflict with Minnesota law, which is settled. *See Potomac Elec. Power Co. v. California Union Ins. Co.*, 777 F.Supp. 968, 972 (D.D.C.1991).

The Minnesota Supreme Court has enumerated the following five factors to be considered when analyzing a choice of law issue: (1) predictability of result, (2) maintenance of interstate and international order, (3) simplification of the judicial task, (4) advancement of the forum's governmental interests, and (5) application of the better rule of law. *Hague v. Allstate Ins. Co.*, 289 N.W.2d 43, 46 (Minn.1978) (citing *Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408 (1973)), *aff'd* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). The Court applies these factors to the present conflict. ·

*1. Predictability of result.* American States argues that this case involves the interpretation of insurance policies issued to a Minnesota corporation through a Minnesota agent. Although it is true that the present action is based on an insurance contract, "the insurance protection has no geographical boundaries 'and it is foreseeable that the insured may meet his misfortune out of the state of issuance' of the policy." *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 726 F.Supp. 740, 744 (D.Minn.1989) (quoting *Hime v. State Farm Fire & Cas. Co.*, 284 N.W.2d 829, 833 (Minn.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980)), *aff'd* 920 F.2d 487 (8th Cir.1990). Therefore, it is foreseeable that Mankato might incur liability outside Minnesota. The fact that the insurance contract arose in Minnesota is not determinative, and predictability of result is not advanced by applying Minnesota law.

*2. Maintenance of interstate order.* This consideration requires that the state whose laws are ultimately applied have sufficient contacts with the litigation to meet the requirements of due process. *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981). The Court concludes that all three states are able to allege sufficient contacts with the litigation to satisfy due process concerns. Minnesota clearly has sufficient contacts to justify application of its law. Plaintiff and defendant both do business in Minnesota; the policies at issue were negotiated and paid for in

Minnesota. Nebraska and Illinois are the states in which the releases of pollutants that gave rise to this dispute occurred. Indeed, a political subdivision of Nebraska has incurred substantial cleanup costs for which it now seeks reimbursement. The Court finds that this factor does not militate a choice of one state's law over another.

3. *Simplification of the judicial task.* Most courts that have considered this factor have treated it summarily, stating that they are perfectly able to apply the law of any proposed jurisdiction. *Board of Regents,* 503 N.W.2d at 490 (citing cases). The Court concurs with that treatment, finding this factor not to be dispositive one way or the other.

4. *Advancement of the forum's governmental interest.* This factor concerns whether the application of another state's law would be inconsistent with the forum state's concepts of equity and fairness. *Hime v. State Farm Fire & Cas. Co.,* 284 N.W.2d 829, 833 (Minn.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). Each state has a strong interest in regulating the insurance industry operating within its borders. It is a matter left primarily to state legislatures and the state judiciary. Application of contrary or uncertain law from other states would be inconsistent with Minnesota's interest in policing the issuance and terms of insurance contracts in the state. Therefore, the Court finds that Minnesota's governmental interest would be hindered by the application of foreign laws.

■ 5. *The better rule of law.* This factor only applies when the first four factors do not clearly resolve the choice of law question. *Myers v. Government Employees Ins. Co.,* 302 Minn. 359, 225 N.W.2d 238, 244 (1974). The Court finds that advancement of the government interest tips the balance in favor of applying Minnesota law to construe the pollution exclusion clause. The Court further notes that the Eighth Circuit has already determined that Minnesota law on this issue is "consistent with the better-reasoned authorities in other jurisdictions." *Bureau of Engraving, Inc. v. Federal Ins. Co.,* 5 F.3d 1175, 1177 (8th Cir.1993).

The Court concludes that Minnesota law applies to the interpretation of the qualified pollution exclusion at issue here.

*(b) Application of Minnesota law*

■ The Minnesota Court of Appeals has consistently held that the "sudden and accidental" exception to the qualified pollution exclusion is unambiguous; the term "sudden" has a temporal connotation of "abruptness." *Krawczewski v. Western Cas. & Surety Co.,* 506 N.W.2d 656 (Minn.Ct.App. 1993); *Board of Regents,* 503 N.W.2d at 491 (Minn.Ct.App.1993); *Sylvester I,* 480 N.W.2d at 375–76. Thus, the Minnesota Court of Appeals has repeatedly ruled that a release or discharge of pollution that occurs gradually over a period of time, rather than relatively quickly, does not fall within the exception to the exclusion. *Board of Regents,* 503 N.W.2d at 491; *Sylvester I,* 480 N.W.2d at 376. The federal courts, applying Minnesota law on this issue, have held that "*Sylvester I* is persuasive authority and the best evidence of Minnesota law," and applied it to deny coverage for gradual releases of pollutants. *Bureau of Engraving,* 5 F.3d at 1177; *accord Bituminous Cas. Corp. v. Tonka Corp.,* 9 F.3d 51, 53 (8th Cir.1993).

■ Mankato is not entitled to coverage under the policies containing a qualified pollution exclusion if this is a "typical" pollution case and the releases occurred gradually rather than abruptly. *See Bureau of Engraving,* 5 F.3d at 1177. The Minnesota Court of Appeals identified five factors that characterize a "typical" pollution case: (1) deliberate disposition of potentially hazardous waste or produced substances, (2) widespread pollution, (3) multiple claimants, (4) damaging action over an extended period of time, usually in the regular course of business, and (5) discovery of the damage years after the polluting conduct. *Grinnell Mut. Reins. Co. v. Wasmuth,* 432 N.W.2d 495, 498 (Minn.Ct.App.1988). The absence of one or more of these factors of a "typical" pollution case does not mean that the pollution exclusion does not apply to that particular case. *Bureau of Engraving v. Federal Ins. Co.,* 793 F.Supp. 209, 213 (D.Minn.1992), *aff'd* 5 F.3d 1175 (8th Cir.1993).

Mankato argues that this case is factually distinguishable from the *Bureau of Engraving* case and is not a "typical" pollution exclusion case for three reasons. First, Mankato asserts that it merely sold batteries to Gould; it did not contract for their disposal as "waste." Second, Mankato claims that it handled the batteries in a responsible manner; it did not "deliberately dispose" of the batteries. Third, Mankato contends that it did not produce or generate the batteries as a normal by-product of its business.

The Court finds this case is a typical pollution case and is indistinguishable from *Bureau of Engraving*. The case before the court has a number of the five factors enumerated in *Grinnell*. Furthermore, there is no material distinction between selling used automobile batteries and disposing of spent etchants; both have served their useful purpose and no longer have substantial value in their current state. The insureds in both this case and *Bureau of Engraving* sold their products to entities they believed to be recyclers. Both recyclers improperly handled the materials they received, causing long-term releases of hazardous substances.

The insurer having established the existence of an exclusion to coverage, the burden falls on the insured to show an exception to that exclusion. *Aetna Ins. Co. v. Getchell Steel Treating Co.*, 395 F.2d 12, 20 n. 9 (8th Cir.1968) (Minnesota law). The release of lead, arsenic, antimony, and cadmium into the soil at the Omaha and Savanna sites allegedly occurred over the course of the two and a half years that Mankato sold lead scrap and batteries to Gould. The Minnesota Court of Appeals has expressly rejected a discharge-by-discharge analysis in evaluating the release of pollutants, noting that "the 'sudden and accidental' exception would swallow the 'rule' of the pollution exclusion." *Sylvester II*, 503 N.W.2d at 797. A reasonable jury could not find that the release of toxic chemicals into the soil was abrupt and "sudden". The Court therefore concludes that the qualified pollution exclusion in the CGL policies effective between July 1, 1978 and August 31, 1985 prevents Mankato from seeking indemnification or defense of its environmental claims.

## III. Mankato's motion for certification to the Minnesota Supreme Court

Mankato has moved the Court to certify the question of

> whether the "sudden and accidental" language in the pollution exclusion of comprehensive general liability policies is ambiguous when dealing with non-active polluters.

In *Bureau of Engraving*, the United States District Court faced a similar argument concerning the insured's passive role in the pollution. The court there held that "deliberate disposition of hazardous substances by the insured does not have to occur before the pollution exclusion applies." 793 F.Supp. at 213. This Court finds that reasoning applicable here.

Mankato argues that the decisions of the Minnesota Court of Appeals—namely *Sylvester I* and *Grinnell*—are inconsistent. In *Bureau of Engraving*, the Eighth Circuit evaluated the decisions and concluded "that *Sylvester I* rationally distinguished *Grinnell* and therefore the two decisions are not inconsistent." 5 F.3d at 1177 Mankato also argues that the phrase "sudden and accidental" is ambiguous, capable of meaning either "unexpected and unintended" or "abrupt and unintended." The *Bureau of Engraving* panel also addressed that issue and determined that the construction given to the "sudden and accidental" language in *Sylvester I* was "consistent with the better-reasoned authorities in other jurisdictions." *Id.* In light of the Eighth Circuit's recent decisions construing these pollution exclusions, the Court finds no reason to certify a question to the Minnesota Supreme Court.

### Conclusion

Pursuant to the foregoing, **IT IS ORDERED** that

(1) American States's motion for summary judgment (Doc. No. 9) is **GRANTED** and American States is entitled to the judgment of the Court that it owes no obligation under the policies issued to Mankato to indemnify

or defend Mankato in the two environmental cleanup actions filed against Mankato;[8]

(2) Mankato's motion for summary judgment (Doc. No. 12) is **DENIED** as untimely;

(3) Mankato's motion for certification (Doc. No. 13) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

**8.** As a result of this Order, the only issue remaining before the Court—Mankato's counterclaim against American States for its failure to defend and indemnify Mankato—is dismissed as moot.