Richard **KRAWCZEWSKI**,
et al., Respondents,

v.

The **WESTERN CASUALTY AND SURETY COMPANY**, a Kansas corporation, Appellant,

**Western National Mutual Insurance**,
et al., Defendants,

**National Indemnity Co.**, a Nebraska corporation, Appellant.

No. C3–93–672.

Court of Appeals of Minnesota.

Oct. 5, 1993.

Review Denied Nov. 23, 1993.

Lauren Lonergan, H. Torbjorn Svensson, Briggs and Morgan, P.A., Minneapolis, for respondent.

Carole Lofness Baab, Richard J. Chadwick, Chadwick, Johnson & Condon, P.A., Minneapolis, for Western Cas. and Sur. Co.

John H. Ramstead, Borkon, Ramstead, Mariani & Letourneau, Ltd., Minneapolis, for Nat. Indem. Co.

Considered and decided by HUSPENI, P.J., and SCHUMACHER and SHORT, JJ.

## OPINION

HUSPENI, Judge.

This appeal is taken from the district court's grant of summary judgment to respondents in this declaratory judgment action and the court's certification of two questions. We reverse the summary judgment and answer the certified questions.

## FACTS

Raymond Krawczewski was the founder and owner of a waste hauling business which he operated as a sole proprietorship under variations of the name "Red Arrow." In 1966, Raymond and his wife, Helen, purchased a 60–acre parcel of land in White Bear Township. On the parcel was a five-acre area that had been used as a town dump, primarily for the disposal of household trash. After purchasing the property, Raymond and Helen continued to allow dumping of household trash at the dump site. In addition, Red Arrow occasionally took waste materials from Reynolds Aluminum Company and Whirlpool Corporation to the dump site.

Some of the drums from Reynolds included oil that was used in Reynolds' machinery. It was Raymond's practice to sell the oil to an oil salvage company and to sell the empty drums as scrap. The drums from Whirlpool contained a variety of materials, including paint. When possible, Raymond would sell the contents of the drums and sell the drums as scrap. Some drums' contents could not be sold. These drums were kept at the dump site.

In 1973, the drums were buried by order of White Bear Township. The drums were sealed, placed upright in the dump site and covered with dirt by bulldozers. The dump site was closed in 1973. After that time, none of the Red Arrow entities hauled waste to the dump site.

Following Raymond's death in 1981, Helen, with their sons Richard and Thomas, operated Red Arrow as a partnership. In July of 1986, Red Arrow received a request for response action (RFRA) from the Minnesota Pollution Control Agency (MPCA). According to the RFRA, the ground water at the dump site has been contaminated with hazardous substances.

The dump site is located above a main ground water aquifer. In addition, there are layers of perched [1] ground water within a few feet of where the drums were buried. According to respondents' expert, it took the contaminants about one year to reach the perched ground water. The contaminants have continued to migrate downwards and have reached the main aquifer.

National Indemnity issued a general liability policy to Raymond L. Krawczewski d/b/a Red Arrow Waste Disposal; the policy provided coverage from January 1, 1979, to January 1, 1982. Western Casualty provided general liability and umbrella liability insurance to the Red Arrow partnership from January 1, 1983, until January 1, 1986. Prior to National Indemnity's coverage period, Raymond Krawczewski and the Red Arrow sole proprietorship were insured by Western National Mutual Insurance Company, which has settled the coverage claims against it.

Under the comprehensive general liability insurance coverage, the Western Casualty policies provide that the insurer

will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * *

B.   property damage to which this insurance applies, caused by an occurrence, and The Western shall have the right and duty to defend any suit against the insured seeking damages on account of such * * * property damage, even if any of the allegations of the suit are groundless, false or fraudulent * * *.

"Occurrence" is defined as "an accident, including continuous or repeated exposure to

1.   Perched ground water is water that is suspended in the soil between the surface and the main aquifer. Perched ground water can be 10 to 20 feet deep. There is some debate as to whether perched ground water can be classified as an aquifer, which is a geologic formation that will yield usable amounts of water.

conditions, which results in * * * property damage neither expected nor intended from the standpoint of the insured." The Western Casualty policies exclude coverage for

> property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The National Indemnity policies contained provisions virtually identical to those found in the Western Casualty policies.

When the MPCA issued the RFRA, respondents sought insurance coverage from various insurers, including Western Casualty and National Indemnity. Respondents commenced the present declaratory judgment action seeking a determination of the rights and liabilities of the parties under the various insurance policies. National Indemnity moved for summary judgment on the claims against it, asserting, inter alia, that the pollution exclusion contained in its policies barred coverage in this case. Respondents moved for summary judgment on the issue of the insurers' duty to defend. Western Casualty moved for summary judgment, asserting, inter alia, that its pollution exclusion clause barred coverage.

The trial court granted respondents' motion with respect to the duty to defend, denied the insurers' motions for summary judgment, and certified the following issues to this court:

> 1. Whether the "release" referred to in the "sudden and accidental" exception to the pollution exclusion clause in the insurance policies issued by the appellants refers to the manner of release of contaminants into the ground water or the manner of release of contaminants from the barrels.
>
> 2. Assuming that "release" refers to the manner of release of contaminants into the ground water, whether, as a matter of law, the release of contaminants was not "sudden" within the meaning of the "sud-

den and accidental" exception to the pollution exclusion clause.

## ISSUES

1. Does the release referred to in the pollution exclusion clause refer to the entry of contaminants into the ground water or the escape of contaminants from the barrels in which they had been buried?

2. If the release refers to entry into the ground water, can the release in the present case be deemed "sudden" for purposes of the "sudden and accidental" exception to the pollution exclusion clause?

3. Did the trial court err in holding Western Casualty and National Indemnity must defend respondents?

## ANALYSIS

Summary judgment is appropriate when there is no genuine issue as to any material fact and a party is entitled to a judgment as a matter of law. Minn.R.Civ.P. 56.03. A material fact is one which will affect the result or the outcome of the case depending on its resolution. *Zappa v. Fahey*, 310 Minn. 555, 556, 245 N.W.2d 258, 259–60 (1976) (per curiam). If genuine issues of material fact exist, the fact that the parties have brought cross-motions for summary judgment will not obviate the need for trial of the factual questions. *Home Mut. Ins. Co. v. Snyder*, 356 N.W.2d 780, 783 (Minn.App.1984).

In reviewing a summary judgment, this court must determine whether there are any genuine issues of material fact and whether the trial court correctly applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). The facts must be viewed in the light most favorable to the party against whom summary judgment was granted. *Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982).

### I. *Release*

■ A. The first question certified by the trial court asks whether the release referred to in the "sudden and accidental" exception to the pollution exclusion clause refers to the release of chemicals from the buried drums

or the release of those chemicals into the ground water.

In *Sylvester Bros. Dev. Co. v. Great Central Ins. Co.*, 480 N.W.2d 368 (Minn.App. 1992), *pet. for rev. denied* (Minn. Mar. 26, 1992) (*Sylvester I* ), this court addressed the question of what constituted release from containment. *Id.* at 373–74. In that case, when waste arrived in drums, landfill employees purposely punctured the drums to allow the contents to drain into the surrounding ground and to minimize the risk of explosion. *Id.* at 370. This court rejected an argument that puncturing and emptying the drums was the relevant release and ruled instead that the relevant release is the release of the contaminants from the landfill into the surrounding ground water. *Id.* at 373–74. The court reached this conclusion after noting that landfills were designed to contain pollutants and that the design was based on the expectation that the soil would act as a filter to prevent pollutants from reaching the underlying ground water. *Id.* at 373.

Respondents here argue that because the barrels in this case were sealed and buried with the intent that their contents not be released, and because the barrels were accidentally, not deliberately, punctured, the relevant "release from containment" occurred when the contents left the barrels. We disagree, and conclude that, as in *Sylvester I*, the release in this case occurred when the contaminants reached the ground water. Regardless of whether the barrels were deliberately or accidentally punctured, there was no covered property damage until the pollutants damaged a third party's property. As long as the contaminants were in the soil, the only damage was to the insured's own property, which is excluded from coverage under the policies. As in *Sylvester I*, there was no release until the contaminants left the insured's property and entered the ground water, which is the property of a third party, the state. This was the injury-in-fact which would have triggered any coverage under the policies. *See Industrial Steel Container Co.*

*v. Fireman's Fund Ins. Co.*, 399 N.W.2d 156, 159 (Minn.App.1987), *pet. for rev. denied* (Minn. Mar. 18, 1987). Also, it is the injury-in-fact which invokes consideration of the exclusion clauses.

■ B. The second question certified by the trial court was whether, as a matter of law, the release in this case was not sudden.[2] In *Sylvester I,* this court held that "sudden" means abrupt and refers to an incident which "occurs relatively quickly rather than gradually over a long period of time." *Sylvester I,* 480 N.W.2d at 375. On remand, the trial court in *Sylvester I* granted summary judgment to the various insurers, concluding that the release of contaminants constituted seepage which was not sudden. This court has recently affirmed the trial court following the remand. *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 503 N.W.2d 793 (Minn.App. 1993), *pet. for rev. filed* (Minn. Aug. 20, 1993) (*Sylvester II* ).

Respondents' expert has testified that the pollutants may have reached the first layer of perched ground water within a year after the barrels leaked. The dump site was closed in 1973, and pollutants were found in the main aquifer in ground water tests conducted in 1986. Accordingly, the pollutants have been working their way down to the aquifer for from one to thirteen years. It was not until the aquifer was found to contain contaminants that the RFRA was issued. It is the clean-up expenses associated with the RFRA that constitute the claim for damages in this case. *See Minnesota Mining & Mfg. v. Travelers Indem. Co.*, 457 N.W.2d 175, 181 (Minn.1990). We conclude that the release of contaminants into the ground water cannot reasonably be considered "sudden." *See Ray Indus. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 768 (6th Cir.1992); *Bureau of Engraving v. Federal Ins. Co.*, 793 F.Supp. 209, 213 (D.Minn.1992); *Borg–Warner Corp. v. Insurance Co. of N. Am.*, 174 A.D.2d 24, 577 N.Y.S.2d 953, 957 (1992); *cf. Lansco, Inc. v. Department of Envtl. Protection,* 138 N.J.Super. 275, 350 A.2d 520, 524 (1975) (vandals' opening of valves on oil storage tanks, caus-

---

**2.** The exclusion clause is inapplicable if the "discharge, dispersal, release or escape" of the materials is sudden *and* accidental. Both conditions must be met. We accept in this analysis that respondents met the requirements of the "accidental" prong.

ing oil to pour into river almost immediately, was sudden release).

In the present case, unlike the situation addressed in this court's opinion in *Sylvester I*, there is no additional evidence which can be adduced on the question of whether the release was sudden. The trial court determined that the Krawczewskis have exhausted all available sources of information.

In view of our decision that there is no coverage, we do not address the duty-to-defend issue. The claims against respondents are not within the indemnity coverage, and there is no duty to defend. *See St. Paul Fire & Marine Ins. Co. v. Briggs*, 464 N.W.2d 535, 540 (Minn.App.1990), *pet. for rev. denied* (Minn. Mar. 15, 1991).

### DECISION

The relevant release occurred when the contaminants reached the ground water. That release, as a matter of law, was not sudden. As there is no coverage, there is no duty to defend.

**Reversed in part, certified questions answered.**