**BELL LUMBER AND POLE COMPANY, Plaintiff,**

v.

**UNITED STATES FIRE INSURANCE COMPANY, Continental Casualty Company, The Hartford Accident and Indemnity Company, Liberty Mutual Insurance Company, Westchester Fire Insurance Company and Centennial Insurance Company, Defendants.**

Civ. No. 4–89–931.

United States District Court,
D. Minnesota,
Fourth Division.

March 21, 1994.

Thomas C. Mielenhausen, Steven A. Mogck, and Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, MN, for plaintiff.

Robert E. Salmon, Stacy A. Broman, and Meagher & Geer, Minneapolis, MN, for defendant Continental Cas. Co.

Scott P. Drawe, Louise A. Behrendt, and Stich, Angell, Kreidler & Muth, P.A., Minneapolis, MN, for defendant Centennial Ins. Co.

## ORDER

DOTY, District Judge.

This matter is before the court on the joint motion of defendants Continental Casualty Company ("CCC") and Centennial Insurance Company ("Centennial") for summary judgment. Bell Lumber and Pole Company ("Bell Lumber") has incurred certain costs related to pollution damage. Bell Lumber brought suit seeking to hold various insurers responsible for those and future related costs. CCC and Centennial contend that their liability insurance policies do not cover Bell Lumber's pollution-related claims. Based on a review of the file, record and proceedings herein, and for the reasons stated below, the court grants defendants' motion for summary judgment.

## BACKGROUND

Bell Lumber sells treated wood poles used for power and telephone lines. Bell Lumber owns and operates a wood treatment facility in New Brighton, Minnesota, and has treated wood there since 1920. Bell Lumber initially treated lumber with creosote. Bell Lumber burned creosote wastes with wood shavings. Bell Lumber also dumped some sludge from its creosote butt tanks in a disposal area located on the New Brighton site. The disposal area was located in a low-lying wetland near a pond on the east end of Bell Lumber's site.[1] Bell Lumber's treatment operation produced between 5,600 and 8,400 gallons of creosote sludge per year. Bell Lumber's use of creosote was phased out in the late 1950s and early 1960s.

In 1946, Bell Lumber began using pentachlorophenol ("penta") as a wood preservative. Penta is an organic chemical produced by reacting chlorine gas with phenol. Bell Lumber placed poles and dry penta crystal in covered treatment tanks. The treatment tanks were connected by underground pipe to oil storage tanks. Hot oil was pumped into the tanks to thermally treat the poles; the weight ratio of penta to oil was about 5 to 6 percent. After the poles became heated, the hot oil was removed and the poles were flooded with cold oil. The cold oil bath allowed the penta to penetrate the poles. The cold oil was quickly extracted and a short hot oil bath followed to remove any residue. The oil was pumped out of the tanks and the poles were left in the tanks for four to six hours. The poles tended to be dry at the end of the process but occasionally penta solution dripped off poles removed from the tanks.

The treatment process created a sludge consisting of oil and penta emulsion, soil and wood particles. The sludge collected in the storage and treatment tanks. From 1952 through 1974, Bell Lumber dumped penta sludge and other waste in the disposal area. Bell Lumber removed the sludge from the bottom of the tanks and shoveled it into 55 gallon drums. The barrels of sludge were taken to the disposal area and poured onto a bed of wood shavings placed directly on the ground. Bell Lumber's wood treatment operation produced approximately 4,000 gallons of sludge per year. Bell Lumber also used penta solution as a herbicide to control weeds around its yard.

Warning labels were placed on penta packages beginning in the late 1940s. Bell Lumber told its employees to avoid breathing vapors emanating from the treatment tanks. It also provided face masks with filters for treating engineers and other employees who worked directly with the penta solution. Bell Lumber cautioned its employees not to let penta come into contact with their skin. Bell Lumber employees who hauled the sludge to

1. Bell employees referred to the disposal area as "the dump."

the disposal area wore rubber suits and gloves. The evidence also indicates that, prior to 1960, the wood preserving industry in general was aware that penta introduced into lakes and streams killed fish.

Over a span of 40 years, Bell Lumber experienced a number of spills of oil mixed with penta and oil mixed with creosote from its treatment and storage tanks. The spills were caused by valves being left open, tanks being filled beyond capacity and boilovers due to excess moisture in the treatment tanks. Bell Lumber used sand dikes, barrels, wood shavings and pumps to recover the spilled preservative and excavated visibly contaminated soil. Bell Lumber employees specifically recall 15 incidents. There was a boilover from a creosote butt tank in the late 1930s. There were two releases from the full-length treatment tanks in the mid–1950s. One release was caused by a fire and a spill; the other by a boilover. A treatment tank was filled beyond its capacity in 1954, resulting in the loss of approximately 2,000 to 3,000 gallons of penta solution.

The largest release occurred in 1963 when an overfill resulted in the loss of 25,000 gallons of penta solution. Between 1965 and 1970, three spills caused a total loss of 4,000 to 6,000 gallons of penta solution. A number of spills occurred in the 1970s. One release was caused by a hole ripped in a treatment tank when a cleat was accidentally removed. Another release was caused by a boilover from a creosote butt tank. A storage tank was filled beyond its capacity in 1974 causing the loss of approximately 2,000 gallons of penta solution. Overfilled treatment tanks caused two other spills in 1974. The second spill may have been caused by a flashover produced by heavy rains. The spilled penta solution reached Pike Lake and killed a number of fish. A few minor spills caused by boilovers and overfills occurred after 1975. There were also two other boilovers with no time frame or loss estimate.

Bell Lumber employees regularly checked the tanks, pumps and pipes for cracks or leaks and repaired them immediately. The entire system could not be visually monitored, however, because a portion of the treatment system was underground. Underground pipes connected the treatment and storage tanks; the three butt tanks and treatment tank number 16, which was installed in 1951, were also partially underground.[2] Bell Lumber used a sump in the pump pit at the north end of tank No. 16 to detect leaks. Despite these efforts, the evidence indicates that penta solution escaped into the ground through cracks or leaks in tanks, pipes and valves.

One treating engineer who began working for Bell Lumber in 1963 stated that tank No. 16 leaked on several occasions and specifically recalled finding six cracks in tank No. 16 over the years. A leak discovered in 1970 caused Bell Lumber to undertake a major renovation and hire an outside contractor to patch the bottom of tank No. 16. A few years later, a crack was found in the seam of tank No. 16 and was repaired. The seam crack could have allowed a major escape of oil before it was discovered. Bell Lumber discovered more cracks in tank No. 16 through testing in the 1980s. The pipes and fittings were also found to have leaks.

The Minnesota Pollution Control Agency ("MPCA") interceded in 1974 after the fish kill incident. The MPCA directed Bell Lumber to clean up the penta solution that flowed into Pike Lake. The MPCA also informed Bell Lumber that it could no longer dump penta sludge in the disposal area. The disposal area was located in a wetland that served as a source of water infiltration to the aquifer below Bell Lumber's property. Groundwater tests in 1979 and 1981 showed penta and creosote contamination under Bell Lumber's property.[3] The MPCA also found that the soil near the disposal area was contaminated. Bell Lumber excavated and backfilled the disposal area in 1983.[4] The

---

2. Treatment tanks numbers 8 and 9 and the storage tanks were above ground and showed no or little signs of leaking.

3. The creosote contamination is primarily at the north end of the process area near the three butt tanks.

4. The disposal area was 100 by 75 feet and 7 to 18 feet deep.

surface and subsurface soil near the process area was also found to be contaminated with penta and creosote. The soil within the process area was excavated by Bell Lumber.

Over 200,000 gallons of penta was found in the groundwater under the process area.[5] Bell Lumber's environmental manager, Daryle Thingvold ("Thingvold") testified that, based on the amount of penta in the groundwater, he believed the contamination in the area of the treatment and butt tanks was primarily "caused by leaks in the treating vessels." A year later, however, Thingvold testified that while leaks from the tanks may have contributed to the contamination, they were not a "major factor." Thingvold also stated that on occasion a valve or pipe joint would develop a small leak but that leaks were repaired immediately.

In February 1984, the MPCA formally requested that Bell Lumber take specific clean-up action concerning surface and subsurface contamination. In May 1985, Bell Lumber agreed to undertake certain remedial measures and pay for the clean-up of its property pursuant to a Consent Order. In 1989, the Environmental Protection Agency notified Bell Lumber that it would pursue a claim against Bell Lumber for the costs of investigating and remedying surface and subsurface contamination. Bell Lumber now seeks to hold various insurers, including Centennial and CCC, responsible for those and future related costs.

It is undisputed that between December 19, 1971 and January 1, 1975, Centennial provided umbrella excess liability insurance to Bell Lumber. The Centennial policy contains a qualified pollution exclusion. Bell Lumber contends that the exclusion is void because Centennial failed to file a form endorsement with the Minnesota Insurance Commissioner prior to issuing the policy. Bell Lumber asserts that it also purchased primary comprehensive general liability ("CGL") insurance from CCC which provided coverage from May 19, 1972 to May 19, 1975. Neither Bell Lumber or CCC can find a copy of the policy. Bell Lumber has produced a

declarations page which indicates that a CGL policy was issued by CCC, the policy number and the effective dates of May 19, 1972 to May 19, 1975.

Centennial and CCC contend that they are entitled to summary judgment for two reasons. First, they argue that the contamination of the soil and groundwater was not the result of an "occurrence" within the meaning of the policies. Second, Centennial and CCC assert that coverage is precluded by qualified pollution exclusions which bar coverage for damage caused by the release of pollutants unless the release was both "sudden and accidental." CCC also contends that Bell Lumber has failed to prove the existence, terms and coverage of the alleged CGL policy.

Bell Lumber responds that neither insurer has demonstrated their policies included qualified pollution exclusions. It also argues that the contamination resulted from an "occurrence" because Bell Lumber did not expect or intend to contaminate the groundwater or soil when it spilled or dumped the penta solution. Bell Lumber maintains that the contamination under its process area was caused by "sudden and accidental" boilovers and overfills from the treatment tanks.

## DISCUSSION

■ The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favor-

---

5. It is estimated that between 200,000 and 755,- 000 gallons of contaminants could be recovered from the soil and groundwater. The estimates

include contamination resulting from both penta and creosote releases.

ing the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510.

■ On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in her favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

■ The interpretation and construction of an insurance policy presents a question of law that the court can properly determine on summary judgment. *Sylvester Bros. Dev. Co. v. Great Central Ins. Co.*, 480 N.W.2d 368, 372 (Minn.Ct.App.1992) ("*Sylvester I*"). The insured has the initial burden of establishing a prima facie case of coverage. *Dakhue Landfill, Inc. v. Employers Ins. of Wausau*, 508 N.W.2d 798, 803 (Minn.Ct.App. 1993). The burden then shifts to the insurer to prove the applicability of an exclusion to coverage. *Id.* The burden returns to the insured to show that an exception to the

exclusion restores coverage. *Id.; Aetna Ins. Co. v. Getchell Steel Treating Co.*, 395 F.2d 12, 20 n. 9 (8th Cir.1968) (Minnesota law). Thus, Bell Lumber has the burden of showing an "occurrence" to trigger coverage, defendants must show the applicability of the pollution exclusion and Bell Lumber must establish the "sudden and accidental" exception to the exclusion.

## 1. The CCC Policy

■ CCC contends that Bell Lumber has failed to prove the existence, terms and coverage of the lost policy which allegedly provided CGL coverage from May 19, 1972 to May 19, 1975. Bell Lumber may establish a prima facie case of coverage through circumstantial evidence. *American States Ins. Co. v. Mankato Iron & Metal, Inc.*, 848 F.Supp. 1436, 1440 (D.Minn.1993) (citing *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 975 F.2d 1130, 1132 (5th Cir.1992)).[6] Bell Lumber has offered evidence that a CGL policy was issued by CCC as well as evidence of the policy limits. Bell Lumber has also established the policy number and the dates of coverage. The court concludes that Bell Lumber has provided sufficient evidence to show the existence of the policy.

Minnesota law does not specify whether a prima facie case requires evidence of the policy terms or is satisfied by proof that the policy existed. Fortunately, the court need not predict what standard the Minnesota courts might adopt. The evidence indicates that CCC issued a standard, pre-printed CGL policy. CCC concedes that if the policy existed it would have covered property damage caused by an "occurrence." CCC has also demonstrated that the policy would have included a qualified pollution exclusion.[7] The

---

6. Minnesota law does not clearly identify the proof required of an insured to state a prima facie claim of coverage when the policy is lost. Relying on the standard that governs proving a lost property deed under Minnesota law, CCC claims that Bell Lumber must prove the existence, terms and coverage of the policy by clear and convincing evidence. However, CCC provides no legal authority or persuasive argument for applying that standard to the proof of a lost insurance policy.

7. Bell Lumber claims that the CGL policy issued by CCC did not include a pollution exclusion because the relevant form number does not appear on the declarations page. CCC has demonstrated that any CGL policy issued or renewed after June 1970 would have excluded pollution damages unless the release of pollutants was sudden and accidental. CCC has also shown that it would not have approved the alleged policy unless a qualified pollution exclusion was attached to Bell Lumber's policy as a separate

court concludes that there is sufficient evidence of the terms of the lost policy for Bell Lumber to survive summary judgment.

## 2. The Centennial Policy

Bell Lumber concedes that the Centennial policy contained a qualified pollution exclusion. It claims, however, that Centennial has failed to prove it filed a form endorsement with the Minnesota Insurance Commissioner prior to issuing the policy. Thus, Bell Lumber maintains that the exclusion is void and unenforceable. Centennial has offered evidence that it filed its form pollution exclusions endorsement with the Minnesota Insurance Commissioner. Centennial has shown that, before selling any policy or endorsement, it always filed the policy or endorsement with the relevant state regulatory body and obtained necessary approval from that regulatory body. Bell Lumber has not offered any evidence to refute that practice. Centennial has also established that its qualified pollution exclusion contained terms similar to those approved by the Minnesota Insurance Commissioner. Accordingly, the court concludes that the Centennial policy contains an enforceable qualified pollution exclusion.

## 3. "Occurrence"

The policies provide coverage for property damage caused by an "occurrence." The Centennial policy defines "occurrence" as

> an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.

The CCC policy defines "occurrence" in a similar fashion.[8] Centennial and CCC argue that the contamination of the soil and groundwater was not the result of an "occurrence" within the meaning of the policies. ▮▮▮ Under Minnesota law, "the word 'expected' denotes that the actor knew or should

have known that there was a substantial probability that certain consequences will result from his actions." *Auto–Owners Ins. Co. v. Jensen*, 667 F.2d 714, 720 (8th Cir. 1981). This standard "involves a higher degree of certainty than reasonable foreseeability." *Sylvester I*, 480 N.W.2d at 372. The court applies an objective standard that turns on whether a reasonable insured should have expected the damage. *Id.; Dakhue*, 508 N.W.2d at 804. *See Bituminous Cas. Corp. v. Tonka Corp.*, 9 F.3d 51, 53 (8th Cir.1993) (test is whether the damage "should have been expected" by the insured) (citation omitted).

## A. Bell Lumber's Disposal of Penta Waste

▮▮▮ The court concludes that Bell Lumber's deliberate disposal of penta sludge on its site precludes coverage for clean up costs related to the disposal area. *See, e.g., Bituminous Cas. Corp. v. Tonka Corp.*, Civ. No. 4–87–392 (D.Minn. August 21, 1992), *aff'd*, 9 F.3d 51 (8th Cir.1993). Bell Lumber did not dispose of penta sludge accidentally. The undisputed evidence shows that Bell Lumber knowingly released penta sludge by routine dumping on its site. The dumping spanned two decades and involved thousands of gallons of penta sludge each year.

There is also evidence that Bell Lumber knew or should have known that dumping the penta sludge would likely cause property damage. Packages of penta carried warning labels and Bell Lumber cautioned its employees to avoid skin contact as well as breathing vapors emanating from the treatment tanks. Bell Lumber employees who hauled the sludge to the disposal area wore rubber suits and gloves; masks with filters were provided for other employees who worked directly with the penta solution. Bell Lumber used penta solution to kill weeds around the site. The evidence shows that, prior to 1960, the wood preserving industry in general was

---

endorsement. Bell Lumber has failed to offer any evidence to the contrary.

8. The CCC policy defines "occurrence" as "an accident, including injurious exposure to condi-

tions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

aware that penta introduced into lakes and streams killed fish.

Bell Lumber claims that it did not know penta was potentially hazardous to the environment during the time it disposed of penta solution on its property. Bell Lumber points out that the full effects of penta were not documented until after it quit on-site disposal. Bell Lumber also notes that government regulations did not cover penta until sometime in the mid–1970s. Bell Lumber may not have known all the dangers of penta at the time, and may not have specifically intended to contaminate the groundwater. The evidence shows, however, that Bell Lumber knew or should have known at the time that there was a substantial probability that penta was a harmful substance and dumping the penta sludge would likely cause property damage.[9] The court concludes that the contamination caused by Bell Lumber's disposal practices did not result from an "occurrence" within the meaning of the policies.

## B. Contamination from Spills and Leaks

▆▆ The soil and subsoil contamination under Bell Lumber's process area is distinct from the contamination caused by its disposal practices. The contamination was caused either by spills or leaks or both. Bell Lumber asserts that it ran a clean operation and that the spills were accidental. Centennial and CCC characterize the spills as regular events and urge the court to hold that the pattern of 15 or so spills at Bell Lumber's site over a span of 40 years negates the finding of an occurrence.

Centennial and CCC contend that Bell Lumber knowingly operated its wood treatment system in such a way that property damage was a substantial probability. The record does not show that Bell Lumber knew or should have known that property damage would result from the spills. Bell Lumber acted quickly to contain and clean up the spills to avoid property damage. The defen-

dants do not contend, nor does the evidence show, that Bell Lumber was aware of any leaks that resulted in substantial contamination. Rather, defendants' assert that undetected leaks from the pipes and underground tank were the main source of contamination under the process area. It is difficult to fathom how Bell Lumber could expect or intend property damage from leaks of which it had no knowledge.

Centennial and CCC also argue that spills were "expected," and therefore not accidental, because they were an inevitable part of Bell Lumber's treatment operation. Coverage is not precluded, however, merely because the spills were reasonably foreseeable. The spills occurred sporadically and appear to be "accidental" as that term is ordinarily used. There is no evidence that Bell Lumber intended to spill penta solution from its treatment tanks. The court concludes that, regardless of the mechanism, a reasonable jury could find that the contamination under Bell Lumber's process area resulted in property damage "neither expected nor intended from the standpoint of the insured."

## 4. Qualified Pollution Exclusion

The insurance policies do not cover damages arising out of polluting activities, unless the release of pollutants was sudden and accidental. The relevant policy language provides:

> This insurance shall not apply:
>
> to personal injury liability or property damage liability arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

9. Bell Lumber claims that it did not know an aquifer existed under its property or that spilling or dumping penta solution would contaminate the groundwater. The court believes that Bell Lumber had no subjective intent to pollute the groundwater. However, the relevant inquiry is whether Bell Lumber knowingly and intentionally disposed of penta in such a fashion that it knew or should have known that property damage would likely result. *Tonka*, 9 F.3d at 54, *aff'd, Tonka, supra*, (D.Minn. August 21, 1992), slip op. at 21.

## A. Application of the Qualified Pollution Exclusion

The Minnesota Court of Appeals has identified five factors that characterize a "typical" pollution case: (1) deliberate disposition of potentially hazardous waste or produced substances; (2) widespread pollution; (3) multiple claimants; (4) damaging action over an extended period of time, usually in the regular course of business; and (5) discovery of the damage years after the polluting conduct. *Grinnell Mut. Reins. Co. v. Wasmuth*, 432 N.W.2d 495, 498 (Minn.Ct. App.1988). The absence of one or more of these factors of a "typical" pollution case does not mean that the pollution exclusion does not apply to that particular case. *See, e.g., Bureau of Engraving v. Federal Ins. Co.*, 793 F.Supp. 209, 213 (D.Minn.1992) ("deliberate disposition of hazardous substances by the insured does not have to occur before the pollution exclusion applies"), *aff'd*, 5 F.3d 1175 (8th Cir.1993).

Relying on *Grinnell*, Bell Lumber argues that the pollution exclusion should not apply to this case. The court disagrees. The conclusion of the Minnesota Court of Appeals in *Grinnell* was limited to the unique facts present in that case. *Sylvester I*, 480 N.W.2d at 376. In the context of "typical" pollution claims, the Minnesota Court of Appeals has consistently followed *Sylvester I* and denied coverage under the "sudden and accidental" pollution exclusion. *Dakhue Landfill, Inc. v. Employers Ins. of Wausau*, 508 N.W.2d 798 (Minn.Ct.App.1993); *Krawczewski v. Western Cas. & Surety Co.*, 506 N.W.2d 656 (Minn.Ct.App.1993); *Board of Regents of the University of Minnesota v. Royal Ins. Co. of America*, 503 N.W.2d 486, 491–92 (Minn.Ct. App.1993), *pet. for rev. granted*, No. C1–93–24 (Minn. Aug. 16, 1993). Moreover, the Eighth Circuit has endorsed the legal distinction drawn by the Minnesota courts. *Bureau of Engraving v. Federal Ins. Co.*, 5 F.3d 1175, 1177 (8th Cir.1993).

Bell Lumber also argues that the pollution exclusion should not apply because it did not knowingly engage in damaging actions. In that respect, this case is indistinguishable from *Sylvester I* and *Dakhue* where the insureds believed that the landfills would effectively contain pollutants. Moreover, the pollution exclusion has been applied where the insured was not directly involved and had no knowledge of the polluting activity. *See Bureau of Engraving*, 5 F.3d at 1175–76 (insured shipped hazardous wastes to a company for environmentally safe disposal but the waste was improperly stored and soil and groundwater contamination resulted); *Mankato Iron, supra*, 848 F.Supp. at 1438–39 (insured sold used automobile batteries and other lead products to recycling facility that improperly handled the materials causing soil and subsoil contamination).

The court concludes that this case is a "typical" pollution case. The case before the court has a number of the five factors enumerated in *Grinnell*. Bell Lumber concedes, as it must, that it deliberately disposed of penta waste in the disposal area for many years. The damages arose from Bell Lumber's disposition of potentially hazardous substances. The damage was discovered years after the polluting conduct. The damaging conduct occurred over a long period of time and in the regular course of business. The court concludes that the pollution exclusion applies in this case.

## B. "Sudden and Accidental" Exception

Under Minnesota law, the sudden and accidental pollution exclusion is unambiguous. *Sylvester I*, 480 N.W.2d at 375–76; *Bureau of Engraving*, 5 F.3d at 1177 (holding that "*Sylvester I* is persuasive authority and the best evidence of Minnesota law").[10] The word sudden carries a temporal connotation of abruptness, requiring that the incident at issue occur "relatively quickly rather than gradually over a long period of time." *Sylvester I*, 480 N.W.2d at 375. Bell Lumber is not entitled to coverage if the release or discharge of pollutants occurred gradually over time.

Bell Lumber maintains that the contamination under its process area was caused by "sudden and accidental" boilovers and over-

---

10. Because the "sudden and accidental" phrase is unambiguous, evidence of the drafting history of the pollution exclusion is irrelevant. *Sylvester I*, 480 N.W.2d at 377.

fills from the treatment tanks. To qualify for the sudden and accidental exception under Minnesota law, Bell must show that the release of contaminants was abrupt. *Tonka Corp.,* 9 F.3d at 53; *Bureau of Engraving,* 5 F.3d at 1177. The Minnesota Court of Appeals has consistently held that the term "release" in the pollution exclusion does not refer to the spillage or disposal of waste but to the entry of the contaminants into the groundwater. *See, e.g., Dakhue,* 508 N.W.2d at 803; *Krawczewski,* 506 N.W.2d at 659; *Sylvester I,* 480 N.W.2d at 373–74. The release of penta into the subsoil and groundwater below Bell Lumber's property occurred over many years. Releases into the groundwater taking place gradually over a long period of time cannot reasonably be construed as sudden. The court concludes that Bell Lumber is not entitled to coverage under the policies due to the operation of the qualified pollution exclusion.

### 5. Contamination by MacGillis

■ MacGillis and Gibbs Company ("MacGillis") is a wood treatment facility located adjacent to Bell Lumber's property. MacGillis began treating lumber with penta in the late 1940s. An explosion in the early 1960s reportedly caused MacGillis to lose between 7,000 and 10,000 gallons of penta solution. MacGillis also used copper-chrome-arsenic ("CCA") to treat wood beginning in 1970. MacGillis apparently had a significant spill of CCA in the 1970s.

From the mid–1960s through the mid–1970s, MacGillis disposed of wastes generated by wood treatment in a disposal area on its property. The disposal area used by MacGillis was adjacent to Bell Lumber's disposal area. MacGillis disposed of treated and untreated poles and posts and untreated wood shavings and chips and penta process wastes in its disposal site. MacGillis generated approximately 6,000 gallons of waste per year. There is evidence that emulsified oils containing CCA migrated onto Bell Lumber's property from the MacGillis site.[11]

Bell Lumber claims that sudden and accidental spills from the MacGillis site were a significant contributing factor to the contamination under Bell Lumber's property. The policies appear to cover damage caused by the intentional acts of third parties if those acts were unintended "from the standpoint of the insured." There is evidence that MacGillis was responsible for the presence of some contaminants found under Bell Lumber's property. There is absolutely no evidence, however, that the release of contaminants from the MacGillis site was sudden.

### CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that the motion of defendants Continental Casualty Company and Centennial Insurance Company for summary judgment is granted. **IT IS FURTHER ORDERED** that defendant Continental Casualty Company's appeal of the orders entered by United States Magistrate Judge Floyd E. Boline, dated September 14, 1993, and October 22, 1993, is denied as moot.

---

11. MacGillis filed for reorganization under Chapter 11 of the United States Bankruptcy Code in October 1982.