BELL LUMBER AND POLE COMPANY, Plaintiff–Appellant,

v.

UNITED STATES FIRE INSURANCE COMPANY; Continental Casualty Company, Defendants–Appellees.

Hartford Accident and Indemnity Company; Liberty Mutual Insurance Company, Defendants.

Westchester Fire Insurance Company; Centennial Insurance Company, Defendants–Appellees.

State of Minnesota, Amicus Curiae.

No. 94–2649.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1994.

Decided July 13, 1995.

Thomas Charles Mielenhausen, Minneapolis, MN, argued (James A. Mennell, on the brief), for appellant.

Robert Edward Salmon, Minneapolis, MN, argued (Andrew W. Horstman, Richard W. Bale, Stacy A. Broman, Scott P. Drawe and Louise A. Behrendt, on the brief), for appellee.

Before McMILLIAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and SHAW,* District Judge.

McMILLIAN, Circuit Judge.

Bell Lumber and Pole Company (Bell Lumber) appeals from final orders entered in the United States District Court[1] for the District of Minnesota, granting summary judgment in favor of Continental Casualty Company (CCC) and Centennial Insurance Company (Centennial), *Bell Lumber & Pole Co. v. United States Fire Ins. Co.*, 847 F.Supp. 738 (D.Minn.1994) (*Bell Lumber I*), and United States Fire Insurance Company (U.S. Fire), and Westchester Fire Insurance Company (Westchester). *Id.*, 853 F.Supp. 315 (D.Minn.1994) (*Bell Lumber II*). (CCC,

---

* The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable David S. Doty, District Judge, United States District Court for the District of Minnesota.

Centennial, U.S. Fire, and Westchester are collectively referred to as the carriers.) For reversal, Bell Lumber argues, among other things, that the district court erred in holding that (1) the qualified pollution exclusion contained in the relevant comprehensive general liability (CGL) and umbrella liability policies issued by the carriers to Bell Lumber barred coverage and (2) there are no genuine issues of material fact as to the inclusion of a qualified pollution exclusion in the policy issued by CCC to Bell Lumber. Also before us on this appeal is a motion by the carriers to strike portions of Bell Lumber's brief which refer to certain rulings by the district court in Bell Lumber's favor. We held the present appeal in abeyance pending the appeal to the Minnesota Supreme Court in *SCSC Corp. v. Allied Mutual Ins. Co.*, 515 N.W.2d 588 (Minn.Ct.App.1994) (*SCSC I*), which has now been decided. *Id.*, 533 N.W.2d 603 (Minn.1995) (*SCSC II*). For the reasons discussed below, we affirm the orders of the district court.

## Background

The background of this case is well-stated in the district court's orders of March 21 and May 26, 1994. *Bell Lumber I*, 847 F.Supp. at 740–42; *Bell Lumber II*, 853 F.Supp. at 316–17. Thus, we provide only a brief summary of the facts.

Bell Lumber operates a wood treatment facility in New Brighton, Minnesota, where it treats wood poles used for power and telephone lines. The dispute in the present case involves whether or not Bell Lumber is entitled to coverage for pollution-related costs under various policies issued by the carriers. Between December 19, 1971, and January 1, 1975, Centennial provided umbrella excess liability insurance coverage to Bell Lumber. The Centennial policy contained a qualified pollution exclusion. We assume, for purposes of this appeal, that from May 19, 1972, to May 19, 1975, CCC provided CGL coverage to Bell Lumber. However, as explained below, we also conclude that, if such a CCC policy existed, it would have included a stan-

dard qualified pollution exclusion. Between May 19, 1975, and November 1, 1987, U.S. Fire provided CGL coverage to Bell Lumber and Westchester provided comprehensive catastrophe (umbrella) liability coverage to Bell Lumber. The U.S. Fire and Westchester policies each contained a qualified pollution exclusion.

The qualified pollution exclusion was substantially the same for each of the insurance policies at issue in the present case. Under these provisions, coverage would be excluded for property damage arising out of the release or escape of contaminants into the soil or groundwater, with the qualification—or exception—that coverage would be allowed if the release or escape were both "sudden and accidental."

From the 1920s until the early 1960s, Bell Lumber treated the poles with creosote. Bell Lumber's creosoting operations produced annually between 5,600 and 8,400 gallons of sludge containing creosote. In the mid–1940s, Bell Lumber began treating the poles with pentachlorophenol (penta). Bell Lumber applied the penta to the poles by placing the poles in treatment tanks and pumping hot and cold oil into the treatment tanks from storage tanks. After the hot and cold oil baths, the oil was removed from the treatment tanks and the poles were allowed to dry in the treatment tanks for several hours before being removed. The poles were inspected and then lifted from the tanks with a crane. On rare occasions, penta solution dripped off the poles during removal from the treatment tanks. Bell Lumber's penta treatments took place in an area referred to as the process area. The penta treatments created a sludge containing oil and penta emulsion, soil and wood particles, which was hauled from the process area to a separate disposal area.[2] Bell Lumber also sprayed penta solution to control weeds in another area where untreated wood was stored. At the time, penta was an approved herbicide.

---

**2.** The disposal area was located in an area that served as a source of water infiltration to the aquifer below Bell Lumber's property. Tests showed penta and creosote contamination in the soil and groundwater beneath the disposal area. In 1983, Bell Lumber excavated and backfilled the disposal area.

Bell Lumber's operations involved the use of numerous tanks, pumps, and pipes, some of which were located underground. Despite Bell Lumber's regular efforts to maintain the integrity of the system, penta solution occasionally escaped into the ground from cracks or leaks in the underground components. In addition, mixtures of oil and creosote, and oil and penta, occasionally spilled onto the ground from storage and treatment tanks. Bell Lumber employees recalled fifteen such events. Some of the spills occurred as a direct result of human error—for example, when the tanks were accidentally overfilled or when someone failed to close a valve. Others were caused by boilovers, resulting from hot oil mixing with cold water within the treatment tanks. On one occasion in 1974, spilled penta solution reached nearby Pike Lake, killing some of the fish. As a result, Bell Lumber was required to clean up the spill.

The surface and subsurface soil near the process area was found to be contaminated with penta and creosote. The groundwater under the process area was found to be contaminated with over 200,000 gallons of penta. According to Bell Lumber's own expert, the fact that a significant amount of contaminated oil was observed to soak into the ground in the process area, such that little could be recovered, suggested that the majority of the spills were not recovered and therefore entered the groundwater and soil beneath the process area. We assume, for purposes of this appeal, that spills were the major source of groundwater and soil contamination at or below the process area.

In February 1984, the Minnesota Pollution Control Agency (MPCA) formally requested that Bell Lumber take specific actions to clean up surface and subsurface contamination. In 1985, pursuant to a consent order, Bell Lumber agreed to undertake the cleanup. In 1989, the Environmental Protection Agency (EPA) notified Bell Lumber that it would bring a claim against Bell Lumber for its investigation and remediation costs associated with surface and subsurface contamination at the New Brighton facility.

Bell Lumber brought this diversity action seeking declaratory judgment holding the carriers liable for cleanup and related past and future costs resulting from the creosote and penta contamination at the New Brighton facility. The carriers moved for summary judgment on grounds that they cannot be held responsible for Bell Lumber's pollution-related claims because such claims are precluded by the qualified pollution exclusions in their various policies. The district court granted the carriers' motions for summary judgment holding that Bell Lumber's claims were excluded as a matter of Minnesota state law based upon certain material facts not genuinely in dispute. *Bell Lumber I,* 847 F.Supp. at 747 (granting CCC and Centennial's motion for summary judgment); *Bell Lumber II,* 853 F.Supp. at 319 (granting U.S. Fire and Westchester's motion for summary judgment). Bell Lumber appealed. On appeal, Bell Lumber focuses specifically on the carriers' obligation to insure its liabilities for environmental damage arising out of penta spills which occurred in the process area of its New Brighton facility.

### Discussion

*The Qualified Pollution Exclusion*

■ In its appeal from the district court's summary judgment decisions, Bell Lumber argues that the district court erred in its interpretation of the qualified pollution exclusion. More specifically, Bell Lumber argues that the district court erroneously held that there are no genuine issues of material fact, and the carriers are entitled to judgment as a matter of law, on the question of whether Bell Lumber has coverage in this case by operation of the "sudden and accidental" exception to the pollution exclusion.

■ We review a grant of summary judgment *de novo.* The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (*Celotex*); *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992); *St. Paul Fire & Marine Ins. Co. v. FDIC,* 968 F.2d 695, 699 (8th Cir.1992). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Crain v. Board of Police Comm'rs,* 920 F.2d 1402, 1405–06 (8th Cir. 1990). In the present case, we are called upon to interpret the language of insurance policies, which involves questions of state law. *Sargent Constr. Co. v. State Auto Ins. Co.,* 23 F.3d 1324, 1326 (8th Cir.1994). We review questions of state law *de novo,* without deference to the district court's legal determinations. *Salve Regina College v. Russell,* 499 U.S. 225, 239–40, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991).

■■■ For purposes of our review of this issue on appeal, we begin by assuming, without deciding, that Bell Lumber established a prima facie case of insurance coverage under its CGL and umbrella liability policies issued by the carriers. Thus, the burden shifts to the carriers to prove the applicability of the pollution exclusion. *SCSC II,* 533 N.W.2d at 611–12 ("[i]f the policy contains an exclusion clause, the burden then shifts to the insurer to prove the applicability of the exclusion as an affirmative defense") (citing *Boedigheimer v. Taylor,* 287 Minn. 323, 178 N.W.2d 610, 614 (1970)). If the carriers make the requisite showing of the existence and applicability of the exclusion, the burden shifts back to Bell Lumber to prove the applicability of an exception to the exclusion, namely, the "sudden and accidental" exception. *SCSC II,* 533 N.W.2d at 611–12. In the present case, it is undisputed that the environmental damage at issue arose out of the release or escape of contaminants into the soil or groundwater. Therefore, the carriers have demonstrated the applicability of the pollution exclusion. The only question remaining is whether such release or escape was "sudden and accidental." As stated above, it is not the carriers' burden to prove that the relevant releases were *not* sudden and accidental, but rather, Bell Lumber's burden to prove that the relevant releases *were* sudden and accidental. Thus, the applicability of this exception is an essential element of Bell Lumber's case. Ac-

cordingly, if there are no genuine issues of material fact as to the non-applicability of the "sudden and accidental" exception, the carriers are entitled to summary judgment on Bell Lumber's claim for insurance coverage.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

The district court held, as a matter of law, that the "sudden and accidental" exception does not apply under the undisputed facts because the term "release" in the qualified pollution exclusion refers "not ... to the spillage or disposal of waste but to the entry of the contaminants into the groundwater." *Bell Lumber I,* 847 F.Supp. at 747 (citing *Dakhue Landfill, Inc. v. Employers Ins. of Wausau,* 508 N.W.2d 798, 803 (Minn.Ct.App. 1993) (*Dakhue* ); *Krawczewski v. Western Casualty and Sur. Co.,* 506 N.W.2d 656, 659 (Minn.Ct.App.1993) (*Krawczewski* ); *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.,* 480 N.W.2d 368, 373–74 (Minn.Ct.App.1992) (*Sylvester Bros.* )); *see also Bell Lumber II,* 853 F.Supp. at 317–19. Because it is undisputed that the release of contaminants into the subsoil and groundwater below Bell Lumber's property occurred gradually, over many years, the district court held that the relevant release could not reasonably be construed as "sudden" for purposes of applying the "sudden and accidental" exception. *Bell Lumber I,* 847 F.Supp. at 747. The district court therefore concluded, as matters of law, that the exception does not apply and coverage is barred under the qualified pollution exclusion. *Id.*

Relying primarily on *SCSC I,* Bell Lumber argues that the district court erred in its analysis because the term "release," for pur-

poses of applying the "sudden and accidental" exception, refers not to the entry of the contaminants into the groundwater, but rather to the issuance of contaminants *from their means of containment.* In *SCSC I,* the Minnesota Court of Appeals affirmed a judgment for the insured and against the insurer upon a jury finding that the soil and groundwater damage in question was caused by a sudden and accidental release of perchloroethylene (perc) on the insured's property. 515 N.W.2d at 594. The release occurred when, over a period of two to three minutes, an estimated 20 to 30 gallons of perc spilled out of a tank through a fill hose, onto the parking lot of the insured's property, and into a seam in the asphalt; that same day, there was a seven-inch rainfall. *Id.* at 592–93. Bell Lumber argues that *SCSC I* is controlling in the present case because the Minnesota Court of Appeals held "[t]he exception to the pollution exclusion clause refers to a sudden and accidental 'discharge, dispersal, release or escape,' of pollutants. These terms connote 'the issuance of a substance from a state of containment.'" *Id.* at 598 (citing *Sylvester Bros.,* 480 N.W.2d at 374). Applying this holding to the facts of *SCSC I,* the court of appeals went on to conclude "[i]t is the suddenness of the release of perc from a state of containment, not the length of time that elapses before the damage is discovered, that determines whether the sudden and accidental exception to the pollution exclusion applies." 515 N.W.2d at 598. Likewise, in the present case, Bell Lumber argues, the manner in which contaminants were released or escaped from the treatment tanks on Bell Lumber's property, not their entry into the groundwater, determines whether the "sudden and accidental" exception applies. Under this approach, Bell Lumber argues, there are genuine issues of material fact.

In *SCSC I,* the Minnesota Court of Appeals noted the following on the issue of what constituted a "release" in that case for purposes of applying the "sudden and accidental" exception:

> In the trial court, [the insurers] took the position that the relevant "release" was the escape from confinement of the perc, rather than the resulting property damage. [One of the insurers] argued that since the present case does not involve a landfill, the relevant discharge of perc was the discharge "from a hose, tank truck or other place of containment." The trial court agreed. [The insurers] cannot complain that the trial court accepted their argument.

*Id.* Thus, the precise legal question of whether the trial court erred in failing to interpret the term "release" as "the entry of contaminants into the groundwater" was not properly before the Minnesota Court of Appeals (nor was it before the Minnesota Supreme Court in *SCSC II* ) because there was no controversy over this issue in the trial court. Nevertheless, the Minnesota Court of Appeals went on to discuss this legal issue, in dicta, as follows:

> [One of the insurers] relies on several cases involving landfills wherein this court has considered what constitutes the "release" of a substance into the environment.... Landfills were built on the assumption that the ground under the waste mass would be able to hold pollutants in suspension above the groundwater.... For this reason, the relevant release was deemed to occur when pollutants leaked out of the soil under a landfill and into the groundwater.... These cases are distinguishable. This case does not involve a landfill and SCSC made no attempt to store perc, suspended in the soil, above groundwater.

*Id.* (citations omitted).[3] Based upon this dicta in *SCSC I,* Bell Lumber urges us to adopt the view that, under Minnesota state law, the term "release," as used in a qualified pollution exclusion, refers to the escape of pollutants from their state of containment, even if that release is into or onto the insured's own property, except in cases involving landfills, where the soil within the landfill is intended to be the means of containment. *SCSC I.*

---

3. Nothing in the Minnesota Supreme Court's decision in *SCSC II* addresses this discussion in

Bell Lumber argues that this approach is consistent with the plain language of the qualified pollution exclusion, that it is sound as a matter of public policy, and that it is consistent with cases relied upon by the district court. Brief for Appellant at 13–27 (citing, e.g., *Dakhue,* 508 N.W.2d at 804) ("it is the migration of pollutants from where they are supposed to stay that constitutes a release from the standpoint of the insured"); *Sylvester Bros.,* 480 N.W.2d at 374 ("these terms carry the connotation of the issuance of a substance from a state of containment")).

In response, the carriers argue that *SCSC I* fails to address the "inextricable link" between the injury-in-fact that triggers coverage under a CGL or umbrella liability insurance policy and the relevant release for purposes of applying a qualified pollution exclusion. In *Northern States Power Co. v. Fidelity & Casualty Co.,* 523 N.W.2d 657, 662 (Minn.1994) (*NSP*), in considering a dispute over the allocation of liability among insurers, the Minnesota Supreme Court observed that "Minnesota follows the 'actual injury' or 'injury-in-fact' theory to determine which policies have been triggered by an occurrence causing damages for which an insured is liable." Under *NSP*, the carriers argue, liability coverage is triggered by an actual injury or injury-in-fact, which occurs when there is damage to the property of a third party. *Id.; see also Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175, 182–84 (Minn.1990) (*3M*) (damages are typically regarded as the sum awarded to a third person as compensation for loss or injury; CGL policies provide coverage for sums which the insured becomes legally obligated to pay because of property damage); *Industrial Steel Container Co. v. Fireman's Fund Ins. Co.,* 399 N.W.2d 156, 159 (Minn.Ct.App. 1987) (property damage occurs for purposes of triggering coverage when the complaining party is actually damaged).

In *3M*, questions of state law were certified to the Minnesota Supreme Court by the federal district court, regarding the meaning of the term "damages" in CGL policies, as that term relates to the obligation of CGL insurers to provide coverage for their insureds' costs in complying with orders of the MPCA and the EPA to clean up groundwater

contamination. In rejecting the insurers' argument that the term "damages" refers only to remedies traditionally recognized at law, as opposed to costs associated with equitable remedies as well, the Minnesota Supreme Court noted that

> [a]ll of the elements of a claim for damages are present in the [MPCA's and the EPA's] claims against the insureds, i.e., the insureds are under a legal obligation to provide compensation to an injured third party. The insureds in these cases have caused the contamination of groundwater beneath their waste disposal sites. Pollution of the groundwater is damage to public property.... The state on behalf of its citizens has a proprietary interest in the natural resources of Minnesota.... The MPCA as an agency of the state is the named trustee of the waters of the state.... Thus, for the purposes of this analysis, the state is the injured third party asserting claims against the insureds.

457 N.W.2d at 182 (citations omitted); *see also SCSC II,* 533 N.W.2d at 611–12 (causal link triggering coverage is established as a matter of law when the expenditures constituting the damages are mandated by MPCA).

In the present case, no actual injury occurred until the contaminants in question entered the groundwater and damaged the property of a third party—namely, the State of Minnesota. Therefore, the carriers argue, the district court appropriately concluded that the "release," for purposes of applying the "sudden and accidental" exception, occurred when the contaminants entered the groundwater, not when they spilled out of the storage tanks onto the soil. The carriers argue that to hold otherwise would improperly divorce the interpretation of the qualified pollution exclusion from the concept of liability insurance coverage. We agree.

█ Having established the "inextricable link" between the actual injury or injury-in-fact that triggers coverage under a CGL or umbrella liability insurance policy and the relevant release for purposes of applying a qualified pollution exclusion, the carriers maintain that the language upon which Bell

Lumber relies from *SCSC I* should be read in conjunction with the following language elsewhere in the same opinion:

> In the present case, *the event triggering liability on the part of SCSC was the entry of perc into the groundwater.* The MPCA's later discovery of the perc in the groundwater did not create liability on the part of SCSC; *the liability was created at the time the groundwater was damaged. The trial court properly held that the trigger of liability was the injury in fact,* not the later discovery of that injury by the MPCA.

515 N.W.2d at 596 (emphasis added). The carriers contend that "the *SCSC I* court's opinion failed to take the next logical step and address the relationship between the injury-in-fact which triggered coverage and the relevant release for purposes of the pollution exclusion." Brief for Appellees at 21. We agree. We reject, as a matter of Minnesota state law, the apparent assumption stated by the *SCSC I* court, in dicta, that a "release," for purposes of applying a qualified pollution exclusion, may occur upon the issuance of pollutants into or onto the insured's own property rather than at the point of entry into the groundwater or upon other property of a third party.[4] Thus, upon *de novo* review, we agree with the district court's conclusion that

> [i]nterpretation of the pollution exclusion . . . cannot be divorced from the concept of insurance coverage. [Liability] [i]nsurance coverage is triggered only when the property of another is damaged. The injury-in-fact which triggers insurance coverage also invokes consideration of the exclusion clauses. Thus, regardless of the type of pollution case, the relevant release occurs when the pollutants leave the insured's property and damage a third party's property.

*Bell Lumber II*, 853 F.Supp. at 318–19 (footnote omitted). In our opinion, this statement summarizes the better reasoned approach on the legal issue before us. Moreover, as the district court thoroughly explained in *Bell Lumber I* and *Bell Lumber II*, and as we further discuss herein, the district court's holding is consistent with the greater weight of Minnesota authority. In the present case, damage to a third party's property did not occur until penta entered the groundwater, which is property of the State of Minnesota. As noted by the district court, the entry of penta into the groundwater occurred gradually, over many years. *Bell Lumber I*, 847 F.Supp. at 747. Therefore, the relevant releases, for purposes of applying the qualified pollution exclusions in the carriers' CGL and umbrella liability policies, were not "sudden," within the meaning of the "sudden and accidental" exception. *See Board of Regents v. Royal Ins. Co.*, 517 N.W.2d 888, 892 (Minn. 1994) (in "sudden and accidental" exception, the term "sudden" is used to indicate the opposite of gradual); *Bureau of Engraving, Inc. v. Federal Ins. Co.*, 5 F.3d 1175, 1177 (8th Cir.1993) ("sudden" means incident occurs relatively quickly, rather than gradually over a long period of time). Accordingly, we affirm the district court's grant of summary judgment in favor of the carriers on grounds that there are no genuine issues of material fact, and the carriers are entitled to judgment as a matter of law, on the issue of whether coverage is barred under the qualified pollution exclusions contained in the liability insurance policies at issue in the present case.

*The CCC Policy*

■ We next consider whether the district court erred in holding that any CGL policy issued by CCC to Bell Lumber after June 1970 would have included a standard qualified pollution exclusion. *See Bell Lumber I*, 847 F.Supp. at 743–44 & n. 7. As discussed

---

4. Ironically, it is unlikely that the outcome in *SCSC I* would have been different had the Minnesota Court of Appeals viewed the relevant release as the entry of the perc into the groundwater, for purposes of applying the qualified pollution exclusion. In that case, there was overwhelming evidence demonstrating not only that the initial spill was sudden and accidental, but also that the

entry of perc into the groundwater was sudden and accidental as well. *See* 515 N.W.2d at 594 (SCSC's hydrogeologists testified at trial, without objection, that the seven-inch rainfall on August 30, 1977, washed the perc through the soil and into the groundwater, which was only twelve feet below the surface at the SCSC site).

above, it was Bell Lumber's burden to establish a prima facie case of coverage. Because Bell Lumber had lost its copy of the alleged CCC policy, it was only able to submit to the district court a copy of a declarations page referring to a CGL policy issued by CCC to Bell Lumber for a policy period of May 19, 1972 to May 19, 1975. The district court held, and we assume for purposes of this appeal, that Bell Lumber met its prima facie burden of showing coverage.

The burden thus shifts to CCC to prove the existence and applicability of a policy exclusion. Because CCC did not concede the existence of the alleged CGL policy, it asserted, as a matter of undisputed fact, that if the alleged CGL policy did exist, it would have contained a standard qualified pollution exclusion. CCC submitted an affidavit from a former CCC underwriter, C. Daniel Molloy, who stated that, having reviewed the declarations page relied upon by Bell Lumber, the CGL policy identified therein would have contained the standard CCC qualified pollution exclusion. Molloy stated that the CCC qualified pollution exclusion became effective on June 24, 1970, for use in Minnesota policies. He further stated that the CCC underwriting department would not have approved the issuance of a policy to Bell Lumber in May 1972 unless the qualified pollution exclusion was attached as a separate endorsement to the policy. Appellant's Appendix at 93–97.

In response, Bell Lumber did not submit any affidavits or other evidence to counter Molloy's affidavit. Instead, it relied solely upon the fact that the declarations page did not specifically identify the qualified pollution exclusion as an attached endorsement. On appeal, Bell Lumber repeats this argument in asserting that the district court erred in granting summary judgment in favor of CCC.

When a properly supported motion for summary judgment is made, an adverse party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Id.; Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Molloy's affidavit established that, notwithstanding the declarations page, if the alleged CGL policy did exist, it would have contained a standard qualified pollution exclusion. Bell Lumber failed to respond to CCC's evidence in a manner sufficient to avoid summary judgment. We therefore hold that the district court did not err in granting summary judgment in favor of CCC.

For the foregoing reasons, the orders of the district court are affirmed.[5]

---

5. Our holdings herein are sufficient to dispose of this case. We therefore decline to address the remaining issues presented in this appeal, including the carriers' motion to strike portions of Bell Lumber's brief.

